**STANDING DEER, aka Robert Hugh Wilson; Cy Skyhorse; James Eagle; Herman Hopson, Ted Ruark; Harold Dupree; Justin Wing; Randy Red Bear; Conrat Krukoff; Donald Richardson; Edward Jones; Homer Black; J.P. Tuckfield; Joseph I. Krombley; Stanford Checrosa; Edward Wanuoskier; James Tayelb; Morrell Watchman, Plaintiffs–Appellants,**

v.

**Norman CARLSON; R.J. Christensen; Charles La Roe, Defendants–Appellees.**

No. 86–6510.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Aug. 4, 1987.

Decided Nov. 10, 1987.

Carol A. Sobel, Los Angeles, Cal., for plaintiffs-appellants.

Suzette Clover, Los Angeles, Cal., for defendants-appellees.

Before WALLACE, HALL and LEAVY, Circuit Judges.

WALLACE, Circuit Judge:

Eighteen Native American prison inmates (inmates) incarcerated at the United States Penitentiary at Lompoc, California (Lompoc) appeal from the district court's entry of summary judgment on their claims against certain prison officials for injunctive and declaratory relief. The inmates argue that a prison regulation banning the wearing of headgear, including religious headbands, in the inmate dining hall unconstitutionally burdens their ability to practice their religion. They contend that summary judgment was inappropriate because prison officials failed to present evidence demonstrating that a blanket ban on headgear in the dining hall was rationally related to legitimate penological objectives or that less restrictive alternatives to the blanket ban were unavailable. The inmates also contend that the prison officials violated the American Indian Religious Freedom Act (Act), 42 U.S.C. § 1996, by promulgating a regulation that adversely affects Native American religious practices without first obtaining and considering the views of the Native American inmates. We have jurisdiction under 28 U.S.C. § 1291, and we affirm.

I

This litigation was prompted by a regulation promulgated by prison officials at Lompoc on September 23, 1985. The challenged regulation governs inmate dining hall attire. It prohibits, among other things, the wearing of any hat, headband, hairnet or other headgear by inmates in the inmate dining hall. The regulation has

been uniformly enforced, and, as a result, the inmates have been forced to remove their headbands while dining or forfeit their meals.

The inmates brought this action for declaratory and injunctive relief, claiming that the blanket ban on headgear violated the Constitution and the Act. The inmates contend that the practice of wearing a headband has special religious significance for Native Americans and that even brief interruptions in this practice seriously intrude upon their religious beliefs.

The prison officials moved for summary judgment. The prison officials did not question the legitimacy or sincerity of the inmates' religious beliefs, but argued that the dress regulation was a rational response to legitimate concerns regarding sanitary and disciplinary conditions in the prison dining hall.

In one declaration filed in support of summary judgment, the warden stated that prior to adopting the dress regulation, he had received numerous complaints from prisoners about dirty clothing and headgear in the dining hall and that several prisoners threatened to "take matters into their own hands" unless prison officials took steps to alleviate unsanitary conditions. According to the warden, the dining hall is the most potentially volatile area in the prison. As many as four hundred prisoners, attended by only three or four guards, spend five to ten minutes standing in long serving lines before sitting down to a twenty minute meal. Prisoners who object to dining hall conditions have no alternative but to eat in the crowded area or forego their meals.

In response to prisoner complaints, the warden spent approximately five weeks observing conditions in the dining room during the noon lunch hour. These observations led him to conclude that unsanitary clothing and headgear did pose problems in the dining area. He feared that prisoners confronted with repugnant conditions in the crowded room would react in a disruptive manner. He therefore concluded that new clothing regulations were necessary to prevent a serious decline in personal hygiene and discipline in the dining room area. As part of the new regulations, the warden decided to implement an across-the-board ban on headgear because he feared that inspecting all headgear for cleanliness would prove impracticable and disruptive. The warden believed that inspections would create the potential for confrontations between prisoners and staff and cause delays in the feeding process that would increase tension in the area and disrupt other institutional programs.

In their opposition to the motion for summary judgment, the inmates argued that the prison officials' moving papers failed to demonstrate that an across-the-board ban on headgear was necessary to promote order and cleanliness in the dining hall area. Specifically, they argued that (1) there was no evidence that the wearing of Native American headbands had created problems in the past; (2) there was no evidence that a ban on headbands would increase cleanliness; (3) there was no evidence that inspecting headgear would create significant delays or provoke confrontations between guards and inmates; (4) there was no evidence that accommodating the inmates' religious needs by providing for religious exemptions to the headgear ban would threaten order; (5) evidence that other federal penitentiaries permitted the wearing of religious headgear in the dining hall undermined the prison officials' claim that an across-the-board ban on headgear was necessary to promote order and cleanliness; and (6) uncontroverted evidence indicated that prison officials had not considered the effect that the dress regulations would have on Native American religious beliefs and practices.

After a hearing on the motion, the district court determined that there were no genuine issues of material fact and granted the motion for summary judgment. The inmates timely appealed.

We review the trial court's entry of summary judgment de novo. *Darring v. Kincheloe*, 783 F.2d 874, 876 (9th Cir.1986). Summary judgment is appropriate only where, after viewing the facts in the light most favorable to the nonmoving party, it

clearly appears that no genuine issue of material fact remains for trial and that the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c); *Ashton v. Cory*, 780 F.2d 816, 818 (9th Cir.1986).

## II

The inmates assert that the dress regulations violate the free exercise clause of the first amendment and the Act. We consider these claims in turn.

### A.

■ The Supreme Court recently articulated the test for determining the constitutionality of regulations that interfere with the right of prisoners to practice their religion: "[W]hen a prison regulation impinges on inmates' constitutional rights, the regulation is valid if it is reasonably related to legitimate penological interests." *O'Lone v. Estate of Shabazz*, — U.S. —, 107 S.Ct. 2400, 2404, 96 L.Ed.2d 282 (1987) (*O'Lone*); *Turner v. Safley*, — U.S. —, 107 S.Ct. 2254, 2261, 96 L.Ed.2d 64 (1987) (*Turner*). A number of factors are relevant in determining whether a challenged regulation is reasonable. These include: (1) whether the regulation has a logical connection to the penological interests invoked to justify it; (2) whether the prisoners remain free to participate in other religious activities; (3) whether accommodating the prisoners, asserted rights would have adverse effects on the institution; and (4) whether ready alternatives that fully accommodate the prisoners' rights could be implemented at *de minimis* cost to valid penological interests. *O'Lone*, 107 S.Ct. at 2405–07; *Turner*, 107 S.Ct. at 2262; *McCabe v. Arave*, 827 F.2d 634, 637 (9th Cir.1987) (*McCabe*).

■ The inmates first contend that summary judgment was inappropriate because the prison officials failed to offer evidence that Indian headbands contributed to sanitation or safety problems in the dining hall. They argue that the absence of such proof precludes a conclusion that the challenged regulation bears a logical connection to legitimate penological concerns.

The inmates' argument is premised on a fundamental misconception of the nature of our inquiry in cases involving the infringement of prisoners' constitutional rights. We do not require that prison officials demonstrate that the prisoners' religious practices are causally related to existing institutional problems. To do so would seriously interfere with "the ability of corrections officials 'to anticipate security problems and to adopt innovative solutions'" to those problems. *O'Lone*, 107 S.Ct. at 2404–05, *quoting Turner*, 107 S.Ct. at 2262. To ensure that we afford appropriate deference to the judgment of prison officials, we restrict our inquiry to considering whether the challenged regulation is *logically connected* to legitimate penological concerns. *Id.; McCabe*, 827 F.2d at 637.

Viewing the evidence in the light most favorable to the inmates, it is clear that the dress regulation involved in this case is logically connected to the concerns of cleanliness, security, and safety that were invoked to justify it. The inmates offered no evidence that contradicted the prison officials' claims that dirty headgear prompted complaints and threats from prisoners. Nor do they suggest that concerns about maintaining hygiene and order in the dining hall are illegitimate. We hold, therefore, that uncontradicted evidence in the record established beyond doubt that the ban on headgear is logically connected to legitimate penological interests.

The inmates next contend that the district court failed to require proof that no reasonable alternatives to the challenged regulation were feasible. Specifically, they argue that the government failed to prove that allowing the inmates to wear their headbands during meals would prove disruptive. They contend that this question raises genuine issues of disputed fact unsuitable for resolution by summary adjudication.

The inmates' argument rests on the mistaken assumption that prison officials must prove " 'that no reasonable method exists by which [prisoners'] religious rights can be accommodated without creating bona

fide security problems.'" *O'Lone,* 107 S.Ct. at 2405 (citation omitted). In *O'Lone,* the Supreme Court emphatically rejected the notion that prison officials bear the burden of disproving the availability of alternatives. *Id.* The Court stated that "[t]hough the availability of accommodations is *relevant* to the reasonableness inquiry, ..." courts must accord "respect and deference ... for the judgment of prison administrators" when considering whether reasonable alternatives to a challenged regulation are available. *Id.* (emphasis added).

The inmates do not contend that restrictions on headgear are unnecessary. Rather, they argue that such restrictions should not apply to individuals for whom headgear has religious significance. The inmates contend that their desire to wear headbands during meals could have been easily accommodated at *de minimis* cost to institutional resources. They suggest that prison staff could briefly inspect religious headgear for cleanliness without creating significant delays in the feeding process.

Even when viewed in the light most favorable to the inmates, it is clear that the accommodations suggested by the inmates could have adverse effects on the institution. It is true that inspecting religious headgear arguably would create only brief delays in the feeding line and would alleviate concerns about unsanitary conditions in the dining hall. However, this plan would, in the judgment of prison officials, give rise to other problems. Here, as in *O'Lone,* prison officials feared that special arrangements for one group could create an appearance of favoritism that could generate resentment and unrest. *Id.* at 2406. Prison officials also determined that requiring guards to inspect religious headgear for cleanliness would create opportunities for personal confrontations between guards and prisoners that could escalate into a fracas involving many prisoners. These concerns provide ample support for the prison officials' conclusion that accommodating the inmates' request to wear their headbands at meals by conducting individual inspections would adversely affect penological objectives.

It may be that there were other alternatives to the policy adopted by the prison officials. However, "prison officials do not have to set up and then shoot down every conceivable alternative method of accommodating the claimant's constitutional complaint." *Turner,* 107 S.Ct. at 2262. The inmates have not pointed to an obvious, easy alternative that fully accommodates their rights at *de minimis* cost to penological interests. *Id.; O'Lone,* 107 S.Ct. at 2407. We hold, therefore, that the district court correctly determined that the prison officials were entitled to judgment as a matter of law.

**B.**

The inmates argue that the prison officials violated the Act by failing to consult religious leaders in the Native American prison population before implementing the dress regulations and by failing to consider the impact the regulations would have on Native American religious practices. The Act provides:

> On and after August 11, 1978, it shall be the policy of the United States to protect and preserve for American Indians their inherent right of freedom to believe, express, and exercise the traditional religions of the American Indian, Eskimo, Aleut, and Native Hawaiians, including but not limited to access to sites, use and possession of sacred objects, and the freedom to worship through ceremonials and traditional rites.

42 U.S.C. § 1996. The inmates contend that the Act requires governmental officials, including prison officials, to consult with Native American religious leaders and to consider Native American religious values before implementing policies or practices that could adversely affect Native American religious practices. Because uncontroverted evidence in the record suggests that prison officials did not explicitly consider the views of the Native American prisoners before imposing regulations banning headgear in the dining hall, the inmates argue that the district court erred in dismissing their claim under the Act.

The prison officials respond that the Act merely states the policy of the United States and does not create obligations enforceable through a private action. They then contend that even if the statute provides the inmates with a private right of action, the statute does not create a procedural obligation on the part of government officials to consult with and consider the views of Native American religious leaders.

■ We need not reach the question whether the Act creates rights enforceable through a private action because we conclude that the statute does not create the procedural rights alleged by the inmates. The statute is clear on its face. Nothing in its language indicates that it creates a procedural obligation on the part of government officials to consult with members of the Native American community before implementing rules of general application. An objective reading of the Act shows that Congress did no more than affirm the protection and preservation of Indian religions as a policy of the United States.

The inmates nevertheless argue that an intent to create a procedural obligation to consult Native American leaders prior to implementation of regulations can be derived from statements in the Act's legislative history. However, where, as here, the language of a statute is unambiguous, examination of the statute's legislative history is unnecessary. *Burlington Northern Railroad Co. v. Oklahoma Tax Commission,* — U.S. —, 107 S.Ct. 1855, 1860, 95 L.Ed.2d 404 (1987) (when a court finds the terms of a statute unambiguous, judicial inquiry is complete); *Tennessee Valley Authority v. Hill,* 437 U.S. 153, 184 n. 29, 98 S.Ct. 2279, 2296, n. 29, 57 L.Ed.2d 117 (1978) ("When confronted with a statute which is plain and unambiguous on its face, we ordinarily do not look to legislative history as a guide to its meaning."). Having concluded that the plain language of the statute contains no reference to the procedural rights claimed by the inmates, we determine that none should be implied.

This is not to say that the Act does not direct federal agencies to consider Native American religious values as part of an agency's decisionmaking process. The District of Columbia Circuit opined that federal officials can prevent unwarranted interference with these values by learning about traditional Indian religious practices. *Wilson v. Block,* 708 F.2d 735, 746 (D.C. Cir.), *cert. denied,* 464 U.S. 956, 104 S.Ct. 371, 78 L.Ed.2d 330 (1983). However, to state that under the Act federal officials should seek to understand and avoid interfering with Native American religious beliefs and practices, *see id.,* is far different from interpreting the Act as invalidating regulations promulgated without explicit consideration of Native American views. We hold, therefore, that the Act does no more than direct federal officials to familiarize themselves with Native American religious values in order to avoid unwarranted and unintended interference with traditional native religious practices.

■ We conclude that uncontradicted evidence in the record demonstrates that the prison officials complied with the Act in the present case. The warden acknowledged that he did not consult Native American leaders and that he did not explicitly consider the Act when making his decision. However, he also testified that he was aware that the inmates attached religious significance to their headbands and that the Act obligated him to recognize these religious beliefs within the context of directing a secure and orderly institution. He stated that he did not believe that his duties under the Act overrode his primary responsibility to maintain security, safety, and order in the institution, and that, reviewing the regulation in light of the Act, he was still convinced that his decision was correct.

Viewing this evidence in the light most favorable to the inmates, we hold that the prison officials fulfilled their obligations under the Act to learn about and avoid unwarranted interference with Native American religious practices. The Act requires consideration of, but not necessarily deference to, Native American religious values. *Id.* at 747. While it is evident that the warden did not explicitly consider the views of Native American prisoners before

implementing the challenged regulation, our determination that the limited intrusion on the inmates' religious practices was warranted in this case, coupled with uncontradicted evidence that the warden was aware both of the religious significance of the headbands and of his obligations under the Act, justify the district court's conclusion that the prison officials were entitled to judgment as a matter of law.

### III

We conclude that the dress regulation is reasonably related to legitimate penological interests. We therefore hold that the regulation does not violate the inmates' free exercise rights and affirm the summary judgment as to the inmates' first amendment claim. We also find that the prison officials complied with their duties under the Act and affirm the summary judgment on that claim.

AFFIRMED.