922 F.2d 370
 John Wesley YOUNG, III, Laurence Mack, Martin D. Kracht,
Calvin S. Carter, Francis A. McKenna, and John
Phillips, Plaintiffs-Appellees,
v.
Michael P. LANE, Director, Department of Corrections, State
of Illinois, Leo L. Meyers, Assistant Director/Adult
Division, Department of Corrections, State of Illinois,
Linda A. Giesen, Warden, Dixon Correctional Center, Larry E.
Sachs, Assistant Warden/Programs, Dixon Correctional Center,
Richard B. Gramley, Warden, Dixon Correctional Center, and
William O'Sullivan, Assistant Warden/Operations, Dixon
Correctional Center, in their official and individual
capacities, Defendants-Appellants.
John Wesley YOUNG, III, Laurence Mack, and Francis A.
McKenna, Plaintiffs-Cross-Appellants,
v.
Michael P. LANE, Director, Department of Corrections, State
of Illinois, Leo L. Meyers, Assistant Director/Adult
Division, Department of Corrections, State of Illinois,
Linda A. Giesen, Warden, Dixon Correctional Center, Larry E.
Sachs, Assistant Warden/Programs, Dixon Correctional Center,
Richard B. Gramley, Warden, Dixon Correctional Center, and
William O'Sullivan, Assistant Warden/Operations, Dixon
Correctional Center, in their official and individual
capacities, Defendants-Cross-Appellees.
 Nos. 89-3382, 89-3489.
 United States Court of Appeals,
Seventh Circuit.
 Argued Sept. 6, 1990.
Decided Jan. 7, 1991.
 
 Gary Sternberg, Kurt Yahn, Andrew Schneiderman, Gershon Kulek, Sternberg & Associates, Chicago, Ill., Karl F. Winkler, Mary P. Gorman, O'Brien, Heeley, Wade & Gorman, Rockford, Ill., for plaintiffs-appellees, plaintiffs-cross-appellants.
 John Wesley Young, III, Mount Sterling, Ill., pro se.
 Neil F. Hartigan, Atty. Gen., William D. Frazier, James P. Nally, Peter V. Bustamante, Asst. Attys. Gen., John A. Morrissey, Office of the Atty. Gen., Chicago, Ill., for defendants-appellants, defendants-cross-appellees.
 Before WOOD, Jr., CUDAHY, and RIPPLE, Circuit Judges.
 WOOD, Jr., Circuit Judge.
 
 
 1
 Dixon Correctional Center ("Dixon"), a penal institution under the direction of the Illinois Department of Corrections, is a former mental hospital that was converted into a prison in October 1983. In May 1988, the time of trial in this action, Dixon was a medium-security prison housing 890 inmates. Of those 890 inmates, seven (less than one percent) were Jewish.[1] This lawsuit addresses their right to exercise their religious beliefs while at Dixon.
 
 I.
 
 2
 Plaintiffs, six former inmates at Dixon, filed individual, pro se complaints that were consolidated into the present action. The gravamen of the consolidated, amended pro se complaint, filed March 1, 1985, was that defendants, officials at both Dixon and the Illinois Department of Corrections during the relevant period, had infringed plaintiffs' first amendment right to exercise their religious beliefs. The March 1985 complaint alleged that defendants: had failed to schedule Jewish religious services; had failed to relieve plaintiffs of work assignments on Jewish holy days; had failed to provide a full-time rabbi; had prevented plaintiffs from conducting their own religious services; had refused to permit plaintiffs to attend religious services in neighboring communities; and had failed to provide plaintiffs with a daily kosher diet. The plaintiffs invoked 42 U.S.C. Sec. 1983 and sought declaratory and injunctive relief as well as compensatory and punitive damages.
 
 
 3
 On October 25, 1985, plaintiffs, with the aid of appointed counsel, further amended their complaint[2] to allege that defendants had restricted plaintiffs in the free exercise of their religion by failing to expend revenue to compensate or reimburse visiting rabbis while at the same time expending revenue to provide clergy for inmates of other faiths. Plaintiffs also alleged that defendants had denied their requests to wear yarmulkes and had failed to establish rules providing for and protecting the religious needs of the Jewish inmates.
 
 
 4
 Defendants denied the substance of plaintiffs' allegations and raised the affirmative defense of qualified immunity. During the course of the litigation, defendants altered their conduct and began to provide plaintiffs with a kosher diet and also reimbursed visiting rabbis for their travel expenses.
 
 
 5
 Prior to trial, on May 4, 1988, defendants filed a motion for summary judgment. Included in that motion was the argument that the injunctive portion of the lawsuit was moot as to four plaintiffs, each of whom was no longer incarcerated at Dixon. While initially denying the motion, the district court later reconsidered and ordered that the motion be taken with the proofs at the time of trial.
 
 
 6
 After bench trial commencing on May 12, 1988, the district court entered an order finding that the plaintiffs' constitutional rights had been violated by those acts alleged in the October 1985 complaint. Specifically, the district court found that the defendants' policy of restricting the wear of yarmulkes violated plaintiffs' first amendment rights. Young v. Lane, 733 F.Supp. 1205, 1209 (N.D.Ill.1990). The district court also found that the defendants' failure, now corrected, to reimburse visiting rabbis had been a violation of plaintiffs' first amendment rights. Id. at 1209-10. Last, the district court found that the defendants had been "inconsistent and slow" in responding to requests by Jewish inmates at Dixon,[3] a course of conduct that it believed was attributable to the Department of Corrections' failure to publish "specific statewide policies."[4] See id. at 1211.
 
 
 7
 As to relief, the district court denied defendants' claims of qualified immunity but found no proof of injury and awarded only nominal damages. Id. Then, with little or no evidence before it regarding conditions at other Illinois penal institutions, the district court proceeded to issue an injunction requiring defendants to issue statewide rules concerning areas in which the defendants' conduct had been found to violate the Constitution as well as areas in which the defendants' conduct had not been found to violate the Constitution.[5] The court also granted attorneys' fees to the plaintiffs. Id. at 1212.
 
 
 8
 After trial, the two plaintiffs remaining at Dixon were transferred to different institutions, and the record presently indicates that only one of the plaintiffs remains incarcerated, although not at Dixon.[6] The district court entertained and denied post-trial motions for reconsideration by both sides, but did grant plaintiffs' petition for attorneys' fees and costs. Defendants filed this appeal, and plaintiffs cross-appealed the district court's failure to reconsider its award of nominal damages. For the following reasons, we reverse and remand with instructions.
 
 II.
 A. Injunctive Relief
 
 9
 Federal appellate jurisdiction is not an exception to the Constitution's "case or controversy" requirement, and a "controversy must normally exist at every stage of [a] proceeding, including the appellate stages." R. ROTUNDA, J. NOWAK & J. YOUNG, TREATISE ON CONSTITUTIONAL LAW: SUBSTANCE AND PROCEDURE Sec. 2.13, at 103 (1986) (citing, e.g., Roe v. Wade, 410 U.S. 113, 125, 93 S.Ct. 705, 712, 35 L.Ed.2d 147 reh'g denied, 410 U.S. 959, 93 S.Ct. 1409, 35 L.Ed.2d 694 (1973)). As part of their effort to remedy perceived constitutional violations at Dixon, the plaintiffs seek to control the defendants' conduct at Dixon by means of an injunction. The plaintiffs, however, by virtue of their transfers, are no longer incarcerated at Dixon. Unaccompanied by any continuing, present injury or real and immediate threat of repeated injury, their past exposure to illegal conduct at Dixon does not show a pending case or controversy regarding injunctive relief, O'Shea v. Littleton, 414 U.S. 488, 495-96, 94 S.Ct. 669, 675-76, 38 L.Ed.2d 674 (1974), and we must vacate as moot that portion of their prayer for relief. See, e.g., Preiser v. Newkirk, 422 U.S. 395, 95 S.Ct. 2330, 45 L.Ed.2d 272 (1975); Rhodes v. Bureau of Prisons, 477 F.2d 347 (5th Cir.1973).
 
 
 10
 Under these circumstances, the only factor that would spare the injunctive relief awarded below is a determination that one of the plaintiffs is "likely to be retransferred" to Dixon.[7] See Moore v. Thieret, 862 F.2d 148, 149-50 (7th Cir.1988); see also Vitek v. Jones, 445 U.S. 480, 487 & n. 5, 100 S.Ct. 1254, 1260-61 & n. 5, 63 L.Ed.2d 552 (1980); Mann v. Hendrian, 871 F.2d 51, 53 (7th Cir.1989). This expectation cannot arise as to those plaintiffs who are no longer incarcerated, see Vitek, 445 U.S. at 487 n. 5, 100 S.Ct. at 1260-61 n. 5, but it can arise as to those plaintiffs who are presently incarcerated and under the aegis of the Illinois Department of Corrections. Moore, 862 F.2d at 150; see also Vitek, 445 U.S. at 487 & n. 5, 100 S.Ct. at 1260-61 & n. 5.[8] Plaintiffs have not made this showing, nor have they been given the opportunity, and we cannot make that factual determination on this record. Accordingly, we remand this issue to the district court for further findings.[9]
 
 B. Monetary Relief
 
 11
 Even if the plaintiffs' transfers moot their claim for injunctive relief, their claim for damages survives. Azeez v. Fairman, 795 F.2d 1296, 1297 (7th Cir.1986); see also Boag v. MacDougall, 454 U.S. 364, 364, 102 S.Ct. 700, 700, 70 L.Ed.2d 551 (1982). The damages claim also suffers from disabilities, however. The alleged violations are neither of such caliber as to rise to the level of constitutional violations nor are they so clearly established as to remove qualified immunity.[10]
 
 
 12
 The free exercise clause of the first amendment provides that "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof...." U.S. CONST. amend. I. That clause, made applicable to defendants by incorporation into the fourteenth amendment, Employment Div. v. Smith, --- U.S. ----, 110 S.Ct. 1595, 1599, 108 L.Ed.2d 876 (1990), would appear to resolve this dispute in favor of the plaintiffs. But the generous language of the first amendment is considerably less generous in the prison context.
 
 
 13
 "Prison walls do not form a barrier separating prison inmates from the protections of the Constitution," Turner v. Safley, 482 U.S. 78, 84, 107 S.Ct. 2254, 2259, 96 L.Ed.2d 64 (1987), but prisoners' constitutional rights may be restricted by the fact of confinement and the needs of the penal institution. See, e.g., Jones v. North Carolina Prisoners' Labor Union, 433 U.S. 119, 125, 97 S.Ct. 2532, 2537, 53 L.Ed.2d 629 (1977). Thus, our task is to balance the plaintiffs' free exercise rights against the legitimate penological objectives of the defendants.[11] Siddiqi v. Leak, 880 F.2d 904, 909 (7th Cir.1989). We are guided in this task by the Supreme Court's directive in Turner that prison regulations and policy decisions[12] are valid so long as they are " 'reasonably related to legitimate penological interests,' " id. (citing Turner, 482 U.S. at 89, 107 S.Ct. at 2261), as well as Turner 's list of factors that are relevant in determining whether this "reasonableness" test has been met:
 
 
 14
 1. Whether: (1) "the governmental objective underlying the regulations at issue is legitimate and neutral"; and (2) the regulations "are rationally related to that objective," Thornburgh v. Abbott, 490 U.S. 401, 109 S.Ct. 1874, 1882, 104 L.Ed.2d 459 (1989); see also Turner, 482 U.S. at 89, 90, 107 S.Ct. at 2261, 2262;[13]
 
 
 15
 2. "[W]hether there are alternative means of exercising the right [in question] that remain open to prison inmates," id. at 90, 107 S.Ct. at 2262;
 
 
 16
 3. "[T]he impact accommodation of the asserted constitutional right will have on guards and other inmates, and on the allocation of prison resources generally," id.; and
 
 
 17
 4. Although the regulation need not satisfy a least restrictive alternative test, "the existence of obvious, easy alternatives may be evidence that the regulation is not reasonable." Id.
 
 
 18
 The standard set out in Turner is not demanding.[14] Reed, 842 F.2d at 962. On the contrary, it is less restrictive than the test ordinarily applied to the alleged infringement of fundamental constitutional rights, O'Lone v. Estate of Shabazz, 482 U.S. 342, 349, 107 S.Ct. 2400, 2404, 96 L.Ed.2d 282 (1987), and is driven by a wide-ranging deference to prison officials,[15] especially state prison officials. Turner, 482 U.S. at 84-85, 107 S.Ct. at 2259. In light of the facts and circumstances of this case, we conclude that the challenged policies comport with the Turner standard.
 
 
 19
 1. Failure to Allow Plaintiffs to Wear Their Yarmulkes
 
 
 20
 The defendants justify their policy concerning uniform headgear, which allows Jewish inmates to wear yarmulkes only inside their cells and during religious services, on the basis of security concerns--yarmulkes could be used to conceal contraband and could also be worn for gang identification purposes. The district court, however, noted that defendants allowed inmates to wear baseball caps at all times and that baseball caps could be used, possibly more effectively, to hide contraband or to identify gang affiliation. In view of this apparent inconsistency, the district court concluded that the policy was not rationally related to the prison's interest and, therefore, that the defendants had failed the first prong of Turner.[16]
 
 
 21
 But this conclusion ignores the fact that a governmental agency can have a strong interest in uniform dress regulations. In Goldman v. Weinberger, 475 U.S. 503, 106 S.Ct. 1310, 89 L.Ed.2d 478 (1986), the Supreme Court addressed a challenge to an Air Force rule that restricted the plaintiff's ability to wear his yarmulke. The Court, acknowledging the military's interest in obedience, unity, commitment, and esprit de corps, upheld the restriction on the plaintiff's religious freedom. Id. at 507, 510, 106 S.Ct. at 1313, 1314.
 
 
 22
 The prison setting, like the military setting, is one in which first amendment rights may be restricted in order to achieve institutional goals, and the defendants' policy can find some support in Goldman.[17] Instead of obedience, unity, commitment, and esprit de corps, however, defendants invoke only one rationale--security. Although not the same as the military's justifications in Goldman, we find the defendants' justification no less meritorious. See Lloyd-El v. Meyer, No. 87 C 9349, 1990 WL 19875 (N.D.Ill. Feb. 22, 1990); see also Washington v. Harper, --- U.S. ----, 110 S.Ct. 1028, 1037, 108 L.Ed.2d 178 (1990) ("The legitimacy, and the necessity, of considering the State's interests in prison safety and security are well established by our cases."); Reed, 842 F.2d at 963; see generally Standing Deer v. Carlson, 831 F.2d 1525, 1528-29 (9th Cir.1987); Butler-Bey v. Frey, 811 F.2d 449, 451 (8th Cir.1987); Rogers v. Scurr, 676 F.2d 1211, 1215-16 (8th Cir.1982).
 
 
 23
 As the Supreme Court noted in Pell v. Procunier, 417 U.S. 817, 823, 94 S.Ct. 2800, 2804, 41 L.Ed.2d 495 (1974), institutional security is "central to all other correctional goals." See also Washington, 110 S.Ct. at 1038 ("There are few cases in which the State's interest in combating the danger posed by a person to both himself and others is greater than in a prison environment, which, 'by definition,' is made up of persons with 'a demonstrated proclivity for antisocial criminal, and often violent, conduct.' "). And modern-day courts recognize that gangs pose a "serious challenge" to that institutional security. See, e.g., Lloyd-El, supra; see also Turner, 482 U.S. at 91-92, 107 S.Ct. at 2262-63. Because evidence in this case, as well as others, see, e.g., Lloyd-El, supra, indicates that gangs try to identify their members by means of such visual aids as hats, prisons may be able to limit the effectiveness of gangs by restricting the variety of available headgear. And in view of this possibility, the strong institutional goal to be served, and the fact that the policy operates with neutrality toward the content of religious expression, we cannot say that defendants' policy is not reasonably related to legitimate penological interests.[18]
 
 
 24
 Furthermore, plaintiffs are not deprived of "all means of expression," Turner, 482 U.S. at 92, 107 S.Ct. at 2263, see also O'Lone, 482 U.S. at 352, 107 S.Ct. at 2406, a situation that augers well for defendants under the second factor in Turner. See id. at 351-52, 107 S.Ct. at 2405-06. First, defendants do allow plaintiffs to wear yarmulkes in their cells and during religious services, and plaintiffs are able to comply substantially with many of the demands of their religion. See id. Second, as we noted in Menora v. Illinois High School Ass'n, 683 F.2d 1030, 1033, 1034 (7th Cir.1982), cert. denied, 459 U.S. 1156, 103 S.Ct. 801, 74 L.Ed.2d 1003 (1983), "[t]he wearing of a yarmulke ... is conventional rather than prescribed," and "while we are not Talmudic scholars we are reasonably confident ... that the precise nature of the head covering and the method by which it is kept on the head are not specified by Jewish law." See also Azeez, 795 F.2d at 1300-01; Brief of the Anti-Defamation League of B'nai B'rith as Amicus Curiae, Goldman v. Weinberger, 475 U.S. 503, 106 S.Ct. 1310, 89 L.Ed.2d 478 (1986).[19] The description of the yarmulke in plaintiffs' complaint as a "traditional Jewish head covering worn by men" confirms our belief that it is a head covering, and not a yarmulke, that Jewish law requires. And while the fact that Dixon inmates can wear a head covering does not remove the religious implications of the uniform headgear policy, it certainly diminishes the plaintiffs' interest.
 
 
 25
 The third factor in Turner also argues in favor of the defendants' policy. Because a nonuniform headgear would limit the effectiveness of defendants' attempt to limit the existence and effectiveness of gangs, the Jewish inmates' right to wear yarmulkes comes at the cost of less liberty and safety for the entire Dixon community, both inmates and guards. See Turner, 482 U.S. at 92, 107 S.Ct. at 2263. Additionally, if defendants allow Jewish inmates to wear yarmulkes, then they must allow other types of religious headgear (thereby rendering the uniform headgear policy a nullity and increasing the safety risk to the entire Dixon community) or risk the undesirable consequences associated with perceived favoritism. See O'Lone, 482 U.S. at 353, 107 S.Ct. at 2406; Standing Deer, 831 F.2d at 1529. And while slippery slopes are not generally convincing, see, e.g., Hunafa v. Murphy, 907 F.2d 46, 47 (7th Cir.1990), this one has some merit,[20] and bolsters the already-present potential for a "ripple effect" similar to that found significant in Turner and O'Lone. See Turner, 482 U.S. at 90, 107 S.Ct. at 2262.
 
 
 26
 As the foregoing discussion indicates, there are no "obvious, easy alternatives to the policy adopted by [defendants]." Id. at 93, 107 S.Ct. at 2263. Moreover, defendants are not required to "set up and then shoot down every conceivable alternative method of accommodating the [plaintiffs'] constitutional complaint." Woods v. O'Leary, 890 F.2d 883, 887 (7th Cir.1989) (citing Turner, 482 U.S. at 90-91, 107 S.Ct. at 2262). As such, all four Turner factors counsel in favor of defendants' policy, and the balance between plaintiffs' free exercise rights and defendants' legitimate penological objectives falls in favor of defendants.
 
 
 27
 2. Failure to Reimburse Visiting Rabbis for Travel Expenses
 
 
 28
 The second violation found by the district court was defendants' failure to reimburse rabbis for their travel expenses to and from Dixon while simultaneously reimbursing other clergy for visiting Dixon. But the free exercise clause guarantees a liberty interest, a substantive right; it does not guarantee that all religious sects will be treated alike in all respects. See Cruz v. Beto, 405 U.S. 319, 322 n. 2, 92 S.Ct. 1079, 1081 n. 2, 31 L.Ed.2d 263 (1972); Thompson v. Commonwealth of Ky., 712 F.2d 1078, 1081 (6th Cir.1983).
 
 
 29
 The Supreme Court in Cruz stated that prisons need not provide every religious sect or group within a prison, regardless of how few in number, with identical facilities or personnel. Cruz, 405 U.S. at 322 n. 2, 92 S.Ct. at 1081 n. 2. That statement appears to condone defendants' behavior, and we can locate no contrary precedent that sufficiently particularizes plaintiffs' argument that defendants must compensate outside clergy to minister to the needs of a religious group that constitutes less than one percent of the prison population. See, e.g., Johnson-Bey v. Lane, 863 F.2d 1308, 1312 (7th Cir.1988) (noting only that prison's provision of clergy for some religions and not others is "troubling" but nevertheless acceptable "to the extent required by the exigencies of prison administration"); Allen v. Toombs, 827 F.2d 563, 568-69 (9th Cir.1987) (inmates had reasonable opportunity to practice their religion when prison officials permitted weekly access by volunteer clergy, when available); Thompson, 712 F.2d at 1080-81 (failure to provide Muslim leader at state expense not actionable under first amendment). If, indeed, there even exists a constitutional requirement that clergy for plaintiffs must be compensated, we cannot reasonably expect defendants to have known of its parameters at the time of their allegedly unconstitutional conduct. As such, the alleged violation has not been so "clearly established" at the time of the conduct as to remove defendants' qualified immunity. See Harlow v. Fitzgerald, 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982).[21]
 
 
 30
 3. "Inconsistent and Slow" Response to the Requests of Jewish Inmates
 
 
 31
 The third violation found by the district court was the defendants' reactive,[22] "inconsistent," and "slow" response to the requests of Jewish inmates, a course of conduct that the district court attributed to the lack of statewide policies at the Department of Corrections. But the mere allegation that defendants have been inconsistent and slow is toothless, for defendants are not constitutionally required to promulgate statewide policies. Their conduct may constitute the manner by which a constitutional violation is accomplished, but it is not, in itself, the constitutional violation; the constitutional violation arises only when defendants' conduct has been inconsistent and slow with respect to a protected first amendment right. Thus, our rejection of defendants' personal liability for the other two violations found by the district court has, by definition, rejected defendants' personal liability for the third "violation."III.
 
 
 32
 Our unflagging concern over jurisdiction requires us to remand the injunctive portion of this case for a determination on mootness, and an analysis of the law in the damages portion of this case reveals that damages are inappropriate.[23] Accordingly, the determination of the district court is
 
 
 33
 REVERSED AND REMANDED.
 
 
 34
 CUDAHY, Circuit Judge, concurring in part, dissenting in part, concurring in the outcome.
 
 
 35
 I agree that the case should be remanded for further findings as to mootness. If the case is moot, we have no basis for considering the injunctive relief provided by the district court. I would defer this merits discussion until another day. On the other hand, I agree that monetary relief is for the most part precluded by qualified immunity.
 
 
 36
 When an appropriate time comes for consideration of the injunctive issues, I would urge a more step-by-step approach than that pursued by the majority here. For example, I can see no valid objection to providing inmates with greater access to religious articles--prayer books, etc. Further, the district court is in a better position than we to gauge the intangibles surrounding prison policy toward religious practice, and we should be careful to accord that court its proper discretionary role.
 
 
 37
 To the extent indicated, therefore, I respectfully dissent.
 
 
 
 [1]
 The percentages are similar on the statewide level. Of the 20,000 inmates in Illinois prisons in May 1988, only 100 to 110, less than one percent, were Jewish
 
 
 [2]
 Rather than file an amended complaint that incorporated and revamped the original pro se complaint, plaintiffs' counsel filed the amending paragraphs as a separate document. This failure to engage in basic housekeeping has made the complaint unnecessarily difficult to comprehend
 
 
 [3]
 While this finding was technically one of fact, both the district court and plaintiffs treat this conduct as central to the litigation and appear to suggest that the defendants' failure to promulgate statewide policies is, in itself, a violation of the Constitution
 
 
 [4]
 The remaining charges in plaintiffs' complaint fall into three categories. First, plaintiffs abandoned their demands for unsupervised services and religious furloughs. Second, the district court specifically found that some conduct by defendants did not infringe plaintiffs' first amendment rights. For example, the district court concluded that Dixon had provided a kosher diet to Jewish inmates since 1985. Young, 733 F.Supp. at 1210. Third, the district court failed to mention whether the defendants' restrictions on access to state-purchased religious materials, the defendants' arrangements with respect to work assignments on the Jewish holy days, and the defendants' failure to schedule Jewish holidays and services on the Dixon calendar constituted violations of plaintiffs' free exercise rights. In light of plaintiffs' abandonment of some of their demands and failure to cross-appeal the district court's determinations on liability, we address only those three liability issues outlined above
 
 
 [5]
 The district court ordered the defendants to formulate guidelines "so as to substantially meet the following goals":
 
 
 [1]
 A Jewish rabbi shall be paid by the prison authority travel expenses and other expenses comparable to that paid to chaplains of other faiths
 
 
 [2]
 Jewish inmates shall be permitted to wear yarmulkes and other religious garments required by their law, at the appropriate times as required by Jewish law
 
 
 [3]
 Religious articles used for services, including daily prayer, shall be available to Jewish inmates, upon request, for use by them in a facility at the prison
 
 
 [4]
 Jewish religious holidays and the Sabbath shall be scheduled on the regular prison calendar
 
 
 [5]
 A kosher diet will be available at all times, except in cases of major disturbances or calamities, but not administrative delay, and will be appropriately varied
 
 
 [6]
 Jewish inmates may meet on their Sabbath with appropriate supervision by a staff member(s) or by a rabbi
 
 
 [7]
 Jewish prisoners may not be required to work under the following standard: The more central the religious activity required by Jewish law is to their religious faith, the greater the presumption will be for the prison officials to relieve the inmate of any institutional program or assignment
 Young, 733 F.Supp. at 1212.
 
 
 [6]
 Specifically, we are told that plaintiff McKenna is currently incarcerated at Joliet in another state prison under the aegis of the Department of Corrections
 
 
 [7]
 While cognizant of doctrines that would allow continued federal jurisdiction over this portion of the plaintiffs' claim, even though it was moot on its face, we note that those doctrines do not apply under these facts. For example, the plaintiffs do not style their lawsuit as a class action. See United States Parole Comm'n v. Geraghty, 445 U.S. 388, 100 S.Ct. 1202, 63 L.Ed.2d 479 (1980) (action brought on behalf of class does not become moot on expiration of named plaintiff's substantive claim); Sosna v. Iowa, 419 U.S. 393, 95 S.Ct. 553, 42 L.Ed.2d 532 (1975). Nor does this case fall within that extraordinary class of claims that are "capable of repetition, yet evading review," Southern Pac. Terminal Co. v. ICC, 219 U.S. 498, 515, 31 S.Ct. 279, 283, 55 L.Ed. 310 (1911); see also Roe, 410 U.S. at 125, 93 S.Ct. at 712, because the prison context does not necessarily confine judicial review to suits of limited duration. Wiggins v. Rushen, 760 F.2d 1009, 1011 (9th Cir.1985) (prisoner's lawsuit "neither challenges a court order which, by its own terms, expires in a few days nor raises questions which are mooted by the termination of a nonjudicial activity that is of short duration"); see also Weinstein v. Bradford, 423 U.S. 147, 149, 96 S.Ct. 347, 348, 46 L.Ed.2d 350 (1975) (per curiam). Last, plaintiffs' counsel does not argue that the defendants transferred the plaintiffs in an attempt to moot their claim
 
 
 [8]
 We would note that Moore implicitly rejects the line of cases in the Second Circuit suggesting that the mere possibility of retransfer is sufficient to keep alive an otherwise moot claim. See, e.g., Richey v. Wilkins, 335 F.2d 1, 6 (2d Cir.1964); Pierce v. LaVallee, 293 F.2d 233, 234 (1961)
 
 
 [9]
 If, indeed, the district court determines that this case is not moot, then we note that the scope of the relief, i.e., a statewide injunction, finds no support from this record. Even if one assumes that the district court properly admitted evidence regarding the conditions at two other Illinois penal institutions--Graham and Dwight Correctional Centers--there is no evidence whatsoever as to conditions at the bulk of Illinois penal institutions. Nor is there evidence that institutions other than Dixon are engaged in a continuing violation of constitutional rights. As such, any injunction that survives our holding must limit its application to continuing violations of constitutional rights at Dixon. See, e.g., Green v. Mansour, 474 U.S. 64, 106 S.Ct. 423, 88 L.Ed.2d 371 (1985)
 
 
 [10]
 In view of our determination on these issues, we need not address the other issues raised by the parties
 
 
 [11]
 We omit the first part of a free exercise analysis, the determination that plaintiffs have sincere religious beliefs. See, e.g., Reed v. Faulkner, 842 F.2d 960, 962 (7th Cir.1988). The district court found that plaintiffs' beliefs were sincere and we find nothing in the record that would allow us to disturb that factual determination
 
 
 [12]
 See Siddiqi, 880 F.2d at 909 (Turner test applies equally to policy decisions of prison officials) (citing Lane v. Griffin, 834 F.2d 403, 406 (4th Cir.1987))
 
 
 [13]
 Turner originally phrased this factor as a question of whether a " 'valid, rational connection' exists between the prison regulation and the legitimate governmental interest put forward to justify it." Turner, 482 U.S. at 89, 107 S.Ct. at 2261 (citing Block v. Rutherford, 468 U.S. 576, 586, 104 S.Ct. 3227, 3232, 82 L.Ed.2d 438 (1984))
 
 
 [14]
 Plaintiffs eloquently make the argument that freedom of exercise should be absolute until defendants prove that the plaintiffs' demands would be, in essence, "detrimental to proper penological objectives" or a "present danger to security and order." However, the Supreme Court rejected such a standard as early as 1977, Jones, 433 U.S. at 128, 97 S.Ct. at 2539, and Turner and O'Lone continue to reject plaintiffs' position. See O'Lone, 482 U.S. at 350, 107 S.Ct. at 2405. Moreover, the exigencies of our prison systems dictate that we cannot allow a "romantic view of constitutional rights of religion" to induce us "to interfere with necessary protections of reasonable discipline." Cochran v. Sielaff, 405 F.Supp. 1126, 1129 (S.D.Ill.1976). As such, we decline plaintiffs' invitation to rewrite, as it were, a generation of case law
 
 
 [15]
 See Turner, 482 U.S. at 84, 107 S.Ct. at 2259 (" 'courts are ill equipped to deal with the increasingly urgent problems of prison administration and reform' ") (citing Procunier v. Martinez, 416 U.S. 396, 405, 94 S.Ct. 1800, 1807, 40 L.Ed.2d 224 (1974)); Bell v. Wolfish, 441 U.S. 520, 562, 99 S.Ct. 1861, 1886, 60 L.Ed.2d 447 (1979) ("[T]he inquiry of federal courts into prison management must be limited to the issue of whether a particular system violates any prohibition of the Constitution.... The wide range of 'judgment calls' that meet constitutional and statutory requirements are confided to officials outside of the Judicial Branch of Government."); see also Jones, 433 U.S. at 125, 97 S.Ct. at 2537; Siddiqi, 880 F.2d at 909
 
 
 [16]
 Plaintiffs also try to weave into the district court's reasoning the argument that inmates at another Illinois penal institution were allowed to wear yarmulkes in an unrestricted fashion, but the Constitution "does not mandate a 'lowest common denominator' security standard, whereby a practice permitted at one penal institution must be permitted at all institutions." Bell, 441 U.S. at 554, 99 S.Ct. at 1882
 
 
 [17]
 See also Chapman v. Pickett, 801 F.2d 912, 919 (7th Cir.1986) (Easterbrook, J., dissenting) ("a prisoner is more like a member of the military than of free society"), cert. granted and judgment vacated and remanded, 484 U.S. 807, 108 S.Ct. 54, 98 L.Ed.2d 19 (1987)
 
 
 [18]
 The district court also noted that the policy as to uniform headgear was not entirely uniform--not all of the baseball caps issued by defendants were of the same color. While this fact in no way strengthens defendants' interest in security, neither is it fatal to their position. Among other reasons, evidence at trial suggested that the number and color variations of these nonuniform hats are limited and that only blue caps have been available since 1987
 
 
 [19]
 The amicus brief contains the following footnote:
 The religious practice of wearing a yarmulke, a head covering worn by observant Jews, is of ancient origin. References to the practice appear in the Talmud, an authoritative compendium of Jewish law completed by approximately 500 C.E. See Tractate Shabbath, 118b and Tractate Kiddushim, 31a (The Traditional Press 1979). The practice has been firmly established since the Middle Ages. For example, Maimonides wrote in his classic 12th century philosophical treatise, The Guide to the Perplexed, Part III, Chapter LII, at 295 (M. Friedlander ed. 1881), that "The great men among our Sages would not uncover their heads because they believed that God's glory was round them and over them...." And Rabbi S.R. Hirsch wrote in his 19th century commentary on the Jewish Siddur (prayer book), Hirsch Siddur, at 14 (1969), that "[t]he Jew symbolically expresses [submission to God] by keeping his head covered, and in this subordination to God he finds his own honor."
 
 
 [20]
 See also Goldman, 475 U.S. at 513, 106 S.Ct. at 1316 (Stevens, J., concurring) (expressing concern that requiring military to allow yarmulkes and other religious headgear would require governmental determinations as to which headgear was religious headgear and would enmesh military in undesirable business of making distinctions between religions)
 
 
 [21]
 The district court, in making its determination on qualified immunity, relied exclusively on the notion that "a prisoner's right to the free exercise of religion in line with reasonable penological interests is clearly established." But we specifically rejected that argument in Colaizzi v. Walker, 812 F.2d 304, 307-08 (7th Cir.1987) (rejecting as too general the argument that "anyone who prevails on the merits of a claim based on (for example) the First Amendment's free exercise of religion clause, however novel that claim is, can defeat the defense of immunity simply by pointing out that the right to the free exercise of one's religion has long been a constitutional right"); see also Anderson v. Creighton, 483 U.S. 635, 639, 107 S.Ct. 3034, 3038, 97 L.Ed.2d 523 (1987) (noting that "Harlow would be transformed from a guarantee of immunity into a rule of pleading" in such a situation); Muhammad v. Wainwright, 839 F.2d 1422, 1424 (11th Cir.1987) ("establishing a standard of review and applying that standard to concrete facts are not the same")
 Additionally, while plaintiffs rely heavily on Williams v. Lane, 851 F.2d 867, 882-83 (7th Cir.1988), cert. denied, 488 U.S. 1047, 109 S.Ct. 879, 102 L.Ed.2d 1001 (1989), that case is very different factually. In Williams, the defendants did not allow communal religious services, did not allow prisoners to participate in rituals of their faith, and deprived the inmates of religious counseling and instruction. Id. at 877-78. Here, defendants merely failed to reimburse a rabbi for travel expenses, an act that was objectively reasonable in light of Cruz.
 
 
 [22]
 Defendants' policy with respect to the requests of the Jewish inmates has been one of reaction, not initiative. This factor alone is not troubling, for we noted in Garza v. Miller, 688 F.2d 480 (7th Cir.1982), cert. denied, 459 U.S. 1150, 103 S.Ct. 796, 74 L.Ed.2d 1000 (1983), another case in which prison officials were accused of following a reactive policy:
 Given the small number of Jewish inmates and the security level of the prison, it was certainly within the officials' discretion to provide a rabbi, services, and other requisites of the Jewish faith only upon request. The absence of religious programs and observances is attributable to the lack of requests, not to any affirmative refusals by the prison officials to provide them.
 Id. at 487. But while Garza may excuse the defendants from canvassing the prison population as to their religious affiliations, it in no way permits defendants to engage in recalcitrant and obstructive behavior once a legitimate request has been made. Defendants cannot forever hide behind Garza; at some point, the prisoners' requests will remove defendants from Garza's friendly confines and into a position in which they are affirmatively refusing to provide legitimately requested services.
 
 
 [23]
 Plaintiffs have not prevailed before this court so as to justify an award of attorneys' fees. As to the proceedings below, the district court, in light of our holding in this case and the hearing on remand, may find it necessary to reconsider its award of attorneys' fees and costs
 
 
 [1]
 Both on brief and in his petition for rehearing, Greenberg relies heavily on Benson v. Scott, 734 F.2d 1181 (7th Cir.1984), cert. denied, 469 U.S. 1019, 105 S.Ct. 435, 83 L.Ed.2d 361 (1984). Benson, a pre-Anderson v. Creighton case, is helpful to Greenberg in its relatively narrow view of qualified immunity. However, it is not clear that Benson was still a state employee when he engaged in the protected speech, and it is therefore equally unclear whether there was a need to balance the state's interest as an employer against the plaintiff's interest in speech. Cf. Egger v. Phillips, 710 F.2d 292 (7th Cir.) (en banc) (FBI agent transferred allegedly in retaliation for complaining to supervisors about co-worker; defendant found qualifiedly immune), cert. denied, 464 U.S. 918, 104 S.Ct. 284, 78 L.Ed.2d 262 (1983)