**Adib H. AQEEL, Plaintiff,**

v.

**Richard SEITER, et al., Defendants.**

No. C2–87–839.

United States District Court, S.D. Ohio.

Dec. 18, 1991.

Adib H. Aqeel, pro se.

Gary David Andorka, Ohio Atty. General's Office, for defendants.

## OPINION AND ORDER

GEORGE C. SMITH, District Judge.

I.

This is a prisoner civil rights case which was filed by Adib Aqeel, and which relates to various events which occurred at the London Correctional Institution in 1986 and 1987. In an order filed on December 21, 1989, this court granted judgment on the pleadings to all defendants and dismissed the case with prejudice.

Aqeel appealed that disposition to the United States Court of Appeals for the Sixth Circuit. In an order which was issued as a mandate on February 6, 1991, this court's order of dismissal was affirmed in part and reversed in part. 922 F.2d 841. The only issue to be addressed by the court on remand was "a development of facts about security concerns upon which defendants' conduct [in ordering Aqeel to remove his tarboosh] may have been warranted." Consequently, upon receipt of the mandate, the court reopened discovery and set a date for filing summary judgment motions.

Defendants conducted discovery, including taking Aqeel's deposition. On August 14, 1991, they moved for summary judgment, and have supported that motion with an affidavit from David Schwarz, the Administrator of Religious Services for the Ohio Department of Rehabilitation and Correction. Aqeel unsuccessfully sought a writ of mandamus which, if issued, would have precluded the court from considering this matter by way of summary judgment motion. In denying mandamus, the Court of Appeals noted that its prior order expressed concern only over the absence of facts supporting the defendant's position, and "did not specify a particular procedure or proceeding the district court had to follow on remand." Aqeel then opposed the summary judgment motion in a brief filed on September 25, 1991. That brief was supported by a number of evidentiary materials, including documents addressed to the question of whether wearing a tarboosh or headcovering is a fundamental tenet of the Islamic faith. The briefing on the summary judgment motion is now complete, and the matter is ripe for decision.

## II.

In considering this motion, the Court is mindful that the standard for summary judgment "mirrors the standard for a directed verdict under [Rule 50(a)], which is that the trial judge must direct a verdict if, under the governing law, there can be but one reasonable conclusion as to the verdict." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986), *citing, Brady v. Southern Ry. Co.*, 320 U.S. 476, 479–480, 64 S.Ct. 232, 234–35, 88 L.Ed. 239 (1943). Thus, the Supreme Court concluded in *Anderson* that a judge considering a motion for summary judgment must "ask himself not whether he thinks the evidence unmistakably favors one side or the other but whether a fair minded jury could return a verdict for the plaintiff on the evidence presented." 477 U.S. at 252, 106 S.Ct. at 2512.

Rule 56(c) of the Federal Rules of Civil Procedure provides in pertinent part:

The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.

In essence, the inquiry is whether the evidence presented a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law. *Anderson*, 477 U.S. at 252, 106 S.Ct. at 2512.

Such an inquiry necessarily implicates the evidentiary standard of proof that would apply at the trial on the merits. As a result, the Court must view the evidence presented through the prism of the substantive evidentiary burden. Rule 56(e) therefore requires that the nonmoving party go beyond the pleadings and by their own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 324, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986). The plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish an element essential to that party's case, and on which that party will bear the burden of proof at trial. *Id.* at 322, 106 S.Ct. at 2552.

In *Banks v. Rockwell International N. Am. Aircraft Operations*, 666 F.Supp. 1053 (S.D.Ohio 1987) (J. Graham), this district enunciated the importance of granting summary judgments in appropriate situations by stating that: "Although summary judgment should be cautiously invoked, it is an integral part of the Federal Rules which are designed to secure the just, speedy and inexpensive determination of every action." *Citing, Celotex Corp. v. Catrett*, 477 U.S. at 324, 106 S.Ct. at 2553 (quoting Fed.R.Civ.P. 1); *Anderson*, 477 U.S. at 252, 106 S.Ct. at 2512.

Thus, the mere existence of a scintilla of evidence in support of a plaintiff's claim is

insufficient—there must be evidence upon which a jury could reasonably find for the plaintiff. Having discussed the Rule 56 standard of review, the Court now turns to the merits.

## III.

Whether the material facts are disputed in this case depends upon the grounds on which the court relies in determining whether summary judgment is appropriate. There are two separate determinations to be made in evaluating an inmate's religious freedom claim. One has to do with the nature of conduct in question: is it something that is a practice or requirement of the particular religion, so that the performance of that act can reasonably be described as the "exercise" of that religion? Even if the inmate can prove that a particular act or observance is the exercise of a religion, however, prison authorities may still validate restrictions on grounds that they are reasonably related to legitimate penological objectives. In some cases, both of these matters will be at issue and will be of crucial importance. In other cases, such as this one, if the evidence concerning legitimate penological interests is sufficient to justify the restriction even if a religious observance is at issue, it is really unnecessary to decide whether the practice in question is part of the inmate's sincerely-held belief concerning the requirements of his religion.

In this case, the parties have differing views on whether adherents of the Islamic faith are required to wear headgear in public. Administrator Schwarz claims, based upon his consultation with several Imams (apparently prayer leaders), that the Muslim faith does not require that Muslims wear tarbooshes at all times. Aqeel, on the other hand, has supplied the court with writings which indicate that certain Muslim scholars disagree, and view going about in public without a head covering as the impermissible adoption of the "way of the graceless people and a repulsive custom." Thus, there is a dispute about this issue. However, the court need not resolve it, based upon its view, more fully expressed below, that Aqeel was properly directed to remove his tarboosh in the dining hall and that RIB proceedings even if his religion directs that he wear a tarboosh at all times.

The remainder of the facts in the case are not in dispute. Aqeel's complaint and his deposition reveal that he was disciplined on a number of occasions, and ultimately transferred to another institution, because he refused orders to remove his tarboosh in the dining hall and when appearing before the Rules Infraction Board. He was permitted to wear the tarboosh at other times in the institution, and the institution also allows Muslims to conduct religious services, to pray, to eat a pork-free diet, to celebrate Ramadan, and to have religious literature. It is also undisputed that the prison policy with respect to the removal of headgear in the dining hall and RIB proceedings was a policy of general application—i.e., it was not limited to Muslims—and although there may have been isolated instances where the policy was not strictly enforced, it was nonetheless content-neutral, and would have applied both to adherents of other religions and to persons who simply wished to wear hats. It is with those facts in mind that the instant motion will be decided.

## IV.

As the court noted in its previous opinion, the proper legal standard to be applied to these facts is that set forth by the Supreme Court in *Turner v. Safley*, 482 U.S. 78, 107 S.Ct. 2254, 96 L.Ed.2d 64 (1987). Recognizing the limited first amendment rights which prisoners enjoy, but concluding that such rights still exist within the prison context, the court directed lower courts to evaluate free exercise claims brought by prisoners in the following manner. If the prison has restricted an activity which is or may be essential to the practice of a particular religion, the court must determine whether the restriction bears a logical connection to a legitimate interest in security or some other legitimate penological interest. The court must also consider whether the inmate has been provided alternative means of exercising his right of freedom of religion, must con-

sider whether accommodating the practice would have a detrimental impact on other inmates, prison personnel, or the allocation of prison resources, and must consider whether there are ready and inexpensive alternatives to the challenged regulation or prohibition. The Sixth Circuit has made it clear that this test applies to religious freedom claims. *Pollock v. Marshall*, 845 F.2d 656 (6th Cir.), *cert. denied* 488 U.S. 987, 109 S.Ct. 239, 102 L.Ed.2d 228 (1988).

In this case, the Schwarz affidavit asserts two penological justifications for the institution-wide restriction against wearing headgear either in the dining hall or at RIB proceedings. First, there is a sanitary goal served by removal of hats in the dining hall. Dirt, dust and grime may accumulate on headgear as well as coats and work boots. The removal of headgear is therefore designed to eliminate this sanitary concern. Further, it is a goal of any penal institution to rehabilitate inmates and prepare them for re-entry into society. Removal of a hat during dining, and in a courtroom proceeding, is designed to have the inmate show respect toward others and comport with the way that society ordinarily conducts itself. These, according to the Schwarz affidavit, are the legitimate penological interests furthered by the policy, and any other policy would cause disruption because other inmates would then desire to wear headgear during these times, and granting special privileges to Muslim inmates would create resentment.

Concerns very similar, if not identical, to these have been accepted by other courts which have dealt with the question of religious headgear in the prison setting. Most recently, the Seventh Circuit decided, in *Young v. Lane*, 922 F.2d 370 (1991), that a prison's refusal to allow Jewish inmates to wear yarmulkes other than in their cells and during religious services was not a violation of the Jewish inmates' right to the free exercise of their religion. The court noted that, in addition to security, governmental agencies such as prisons have "a strong interest in uniform dress regulations." *Young*, 922 F.2d at 375. Non-uniform dress regulations would create the risk of "undesirable consequences associat-

ed with perceived favoritism." *Id.* at 377. Citing to the Supreme Court's decision in *Goldman v. Weinberger*, 475 U.S. 503, 106 S.Ct. 1310, 89 L.Ed.2d 478 (1986) which validated an Air Force regulation prohibiting the wearing of any religious headgear while in uniform, the court concluded that the military and the prisons had similar interests in uniformity and discipline, and that a prison could therefore prohibit the wearing of yarmulkes as long as the prisoners were given other means of exercising their religion.

The same result was reached in *Standing Deer v. Carlson*, 831 F.2d 1525 (9th Cir.1987), which involved a claim by native Americans that they were constitutionally permitted to wear a headband at all times, including in the dining hall. There, the prison expressed a similar concern that wearing headgear in the dining hall contributed to unsanitary conditions. Given the close quarters and large number of inmates in the dining hall, wearing unsanitary clothing could create discipline problems. Concluding that a uniform ban on headgear "is logically connected to legitimate penological interests" and that a selective ban could "generate resentment and unrest," the court upheld the ban. *Standing Deer*, 831 F.2d at 1528, 1529. Similar results were reached in *Benjamin v. Coughlin*, 708 F.Supp. 570 (S.D.N.Y.1989), aff'd 905 F.2d 571 (2d Cir), *cert. denied* — U.S. ——, 111 S.Ct. 372, 112 L.Ed.2d 335 (1990), (involving Rastafarian "crowns"), and *Israel v. Koehler*, 1989 U.S. Dist. LEXIS 8243 (S.D.N.Y.1989) (involving "diadems" worn by members of the Hebrew Israelite religion).

The court has located one case which struck down a prison ban on wearing headcoverings, or kuffis, by Muslims in a prison setting. *Lloyd–El v. Meyer*, 1989 WL 88371, 1989 U.S. Dist. LEXIS 8954 (N.D.Ill. 1989). In that case, however, the prison banned the kuffis in all areas other than cells and authorized religious services, but permitted inmates to wear state-issued baseball caps or stocking caps throughout the prison. In that case, unlike this one, the restriction was specifically directed to

wearers of religious headgear, and non-religious headgear was permitted in other places. By contrast, the policy enforced against Aqeel was applied to religious headgear and non-religious headgear alike.

It is clear that a uniform dress policy, which includes as some of its features removal of hats in a dining hall, and removal of headgear during courtroom-type proceedings, cannot co-exist with allowing inmates of particular faiths, whether they be Jews, Muslims, Rastafarians, or Christians, to wear their headgear at those times and in those places. It is equally clear that every court which has considered the question has viewed sanitation and orderliness as legitimate penological goals, and favoritism towards certain inmates, for whatever reason, to be a dangerous practice in the prison setting. Where, as here, it is undisputed that members of the Islamic faith are permitted to engage in other forms of worship, and to wear their headcoverings at most times during the day, a policy such as the one enforced by officials at the London Correctional Institution, and which resulted in Aqeel being ticketed on numerous occasions for refusing to obey orders, is constitutionally permissible. That being the case, disciplining Aqeel for refusing to obey orders to remove his tarboosh did not violate any of his constitutional rights.

The court does note that Aqeel has argued that what occurred in 1986 and 1987 was not the result of any "policy" but was rather simply a series of unconnected, discretionary acts performed by prison officials. He asserts that the policy described by the Schwarz' affidavit does not exist because he was allowed to wear work clothes and work boots in the dining hall, and because on at least one occasion he was not asked to remove his tarboosh during disciplinary proceedings. The fact that prison policies are not enforced 100% of the time is not, without more, evidence that the policies do not exist. It is apparent that Aqeel ran afoul of prison rules only in the dining hall and RIB settings. He has not submitted facts which would support the discriminatory application of the policy, or which would contradict in any substantial measure the Schwarz affidavit's assertion

that such a policy existed. Under those circumstances, the court is satisfied that the actions of prison officials in this case comported with their duty to permit Aqeel to practice his religion in a manner consistent with his status as a state prisoner. Nothing more is required.

V.

Based upon the foregoing, the Court concludes that the orders directing Aqeel to remove his tarboosh, issued to him at the London Correctional Institution in 1986 and 1987, were constitutionally valid orders. Consequently, the defendants' motion for summary judgment is GRANTED. This action is DISMISSED WITH PREJUDICE. The Clerk is directed to enter judgment in favor of the defendants.