Michael Allen SUTTON, Plaintiff,

v.

Terry STEWART, et al., Defendants.

No. CIV–96–1607–PCT–ROS.

United States District Court,
D. Arizona.

Aug. 7, 1998.

Michael Allen Sutton, Yuma, AZ, pro se.

R Elizabeth Teply, Arizona Attorney General's Office, Phoenix, AZ, for Terry L Stewart, George Herman, DC Harkins, CSO Laswell, John Maliepaard, Chaplin Grant, Oscar Yonnie, CPO, M. McComas, CPO II, Mike Linderman.

**1100**

## ORDER

SILVER, District Judge.

## BACKGROUND

Plaintiff Michael Sutton is a prisoner at the Arizona State Prison Complex–Winslow ("Winslow") in the custody of the Arizona Department of Corrections ("ADOC"). Plaintiff has alleged that Terry L. Stewart, Samuel A. Lewis, George Herman, D.C. Harkins, Chaplain John Maliepaard, Errol Grant, Lansford, Darlene Laswell, Oscar H. Yonnie, Michele McComas, and Mike Linderman, in their official and individual capacities, have denied Plaintiff his First Amendment right to the free exercise of his religion as elaborated by Congress in the Religious Freedom Restoration Act of 1993 ("RFRA"), his Fourteenth Amendment right to the equal protection of the laws, and have obstructed his mail in violation of 18 U.S.C. § 1702 and prison policy. Plaintiff seeks monetary, declaratory, and injunctive relief.

Defendants have moved for summary judgment against Plaintiff on every count of his Complaint. Defendants contend that Plaintiff has failed to establish the presence of a genuine issue of material fact concerning his First and Fourteenth Amendment claims and his obstruction of mail claim. Further, Defendants argue that because the Supreme Court recently invalidated RFRA as an unconstitutional exercise of Congress's Fourteenth Amendment enforcement power, the Court lacks jurisdiction to hear Plaintiff's RFRA claim. Finally, Defendants assert a

qualified immunity defense for claims against Defendants in their individual capacities and assert Eleventh Amendment immunity from suit against Defendants in their official capacities.[1] Plaintiff has responded in opposition.

## DISCUSSION

Plaintiff has alleged a variety of civil rights violations pursuant to 42 U.S.C. § 1983: (1) denial of his First Amendment right to free exercise of religion; (2) denial of his Fourteenth Amendment right to equal protection of the laws; and (3) obstruction of his mail. Plaintiff also alleges a violation of his right to religious exercise under RFRA. He seeks monetary, declaratory, and injunctive relief. Because the Supreme Court invalidated RFRA in *City of Boerne v. Flores,* 521 U.S. 507, 117 S.Ct. 2157, 138 L.Ed.2d 624, (1997), the Court will consider Plaintiff's free exercise claim under the pre-RFRA standard.[2]

### I. Free Exercise

Plaintiff alleges several violations of his right to freely exercise his religion. Defendants denied him access to scented oils for use in Muslim prayer rituals and will not permit him to possess and wear kufi prayer caps at all times.[3] Defendants also refused to allow Plaintiff to receive scented oils from his mother's business.[4] Additionally, Plaintiff has been denied permission to wear a beard that he insists is essential to his Muslim faith. Finally, Plaintiff contends that

---

1. Because the Court finds that there is no constitutional violation, it will not address Defendants' immunity claims. *See Siegert v. Gilley,* 500 U.S. 226, 231, 111 S.Ct. 1789, 114 L.Ed.2d 277 (1991) (noting that a court must first find a constitutional violation in order to consider qualified immunity); *Pena v. Gardner,* 976 F.2d 469, 471 (9th Cir.1992) (requiring that a plaintiff allege facts sufficient to state a claim before the court would consider qualified immunity).

2. Since the Supreme Court's decision in *City of Boerne,* the Ninth Circuit has evaluated RFRA claims as First Amendment claims *simpliciter* using the pre-RFRA standard. *See, e.g., Freeman v. Arpaio,* 125 F.3d 732, 735 (9th Cir.1997) (noting that the Supreme Court's decision in *City of Boerne* "restored the reasonableness test as the applicable standard in free exercise challenges").

3. Plaintiff is permitted to wear the prayer cap in his cell, during recognized religious ceremonies, and in designated living areas. (Defs.' Statement of Facts at 6, 15, 55.)

4. Prison policy formerly permitted Muslim inmates to possess scented oils for use in their prayer ritual. Since December 1996, however, scented oils have been prohibited for all inmates. Prison policy also prohibits inmates from receiving religious articles from family members and requires that inmates acquire such items from approved religious vendors. Plaintiff's allegations of unequal treatment regarding the receipt of religious articles from family members will be discussed in the section devoted to Plaintiff's equal protection claims.

prison officials have not allowed him to participate in essential Muslim prayer services.[5]

Defendants contend that the items Plaintiff was denied—oils, kufis, and a beard—are not religiously mandated and therefore Plaintiff's right to freely exercise his religion was not substantially burdened by their denial. Moreover, even if the items in question were essential to Plaintiff's religious practice, Defendants note that prison officials need only show that a challenged regulation is reasonably related to a legitimate penological interest in order to justify a limitation on a prisoner's free exercise right. In this case, Defendants have offered various security interests to justify their denial of Plaintiff's religious items.

## A. Religious Mandate

 The Ninth Circuit has affirmed that in order for a plaintiff to sustain a free exercise claim, he must demonstrate that the contested practice is "religiously mandated or otherwise so central to belief that its prohibition would impose a genuine burden on religious expression." *North Valley Baptist Church v. McMahon*, 696 F.Supp. 518, 528 (E.D.Cal.1988), *aff'd*, 893 F.2d 1139 (9th Cir.1990).[6] Defendants claim that because Plaintiff has failed to demonstrate that scented oils, kufis, and a beard are religiously mandated, his First Amendment claim is without merit.

Despite Defendants' assertions, Plaintiff has provided evidence to suggest that oils, kufis, and a beard are religiously mandated by the Sahih variant of the Muslim faith. Concerning the use of scented oils, Plaintiff cites *The Figh of the Friday Prayer* by J. Zarabozo. (Sutton Aff. ¶ 15.) The wearing of the kufi prayer cap is purportedly mandated as well by Plaintiff's faith, as indicated in *Gardens of the Righteous* and *The Lawful and Prohibited in Islam.* (Compl. at 5G.) Finally, the wearing of a beard respects the

instruction "in the Hadith of the Holy Prophet Muhammad." (Sutton Aff. ¶ 12.)

 At the summary judgment stage, the Court does not evaluate the validity of a plaintiff's religious claims or of the authorities he cites to substantiate them. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986) ("evidence of a nonmovant is to be believed and all reasonable inferences are to be drawn in his favor"); *see also United States v. Ballard*, 322 U.S. 78, 87–88, 64 S.Ct. 882, 88 L.Ed. 1148 (1944) (concluding that a trial court properly refrains from considering the truth or falsity of an individual's religious views). It is sufficient to note that Plaintiff has provided admissible evidence to create a genuine issue of material fact concerning the mandatory nature of the items in question. Defendants have relied on the opinion of ADOC's Islamic Contractor concerning the regulations, but have offered no evidence challenging the sufficiency of Plaintiff's religious authorities. In this respect, Defendants are not entitled to summary judgment.

## B. Legal Standard for Prisoner Free Exercise Claims

 Defendants correctly note that though prisoners retain their right to freedom of religion, this right may be reasonably curtailed in furtherance of legitimate penological interests. *See Turner v. Safley*, 482 U.S. 78, 89, 107 S.Ct. 2254, 96 L.Ed.2d 64 (1987); *see also Freeman*, 125 F.3d at 735 (citing *Turner*). Under the test established by the Supreme Court in *Turner*, Plaintiff must show that Defendants have "burdened the practice of his religion, by preventing him from engaging in conduct mandated by his faith, without any justification reasonably related to legitimate penological interests." *Freeman*, 125 F.3d at 735 (footnote omitted). To determine whether Defendants' conduct was reasonable, the Court must consider four factors: (1) whether the regulation has a

---

5. Plaintiff's claim that he was not permitted to perform certain Muslim services appears to be a reference to the fact that ADOC formerly did not recognize Eid Al–Adha, an observance unique to Plaintiff's Sahih Muslim faith. Defendants have permitted the Eid Al–Adha since 1995.

6. To state a valid free exercise claim, a claimant's belief must also be sincerely held in order to merit First Amendment protection. *See Callahan v. Woods*, 658 F.2d 679, 688 (9th Cir.1981). Defendants, however, have not challenged the sincerity of Plaintiff's belief.

logical connection with a legitimate governmental interest; (2) whether alternative means exist for Plaintiff to exercise his right; (3) what the impact will be on prison staff, inmates, and administration of accommodating Plaintiff's right; and (4) the existence of ready alternatives to Defendants' regulation that may be accomplished at minimal cost to legitimate penological interests. *See Turner*, 482 U.S. at 89, 107 S.Ct. 2254. Further, the *Turner* Court emphasized that state prison officials should be accorded considerable deference in administrative decision making. *Id.* at 84, 107 S.Ct. 2254. Thus, Defendants need not demonstrate a compelling governmental interest to justify a regulation nor establish that the regulation is the least restrictive means of achieving their legitimate penological goals. *Id.* at 89, 107 S.Ct. 2254. Moreover, Defendants are not required to demonstrate a causal connection between the prohibited practices and existing institutional problems. *See Standing Deer v. Carlson*, 831 F.2d 1525, 1528 (9th Cir.1987). Rather, they need only show a logical relationship between the challenged regulation and a valid penological objective. *See id.*

### 1. Rational Relation Between Challenged Regulations and Legitimate Penological Interests

██ ADOC policy prohibits inmates from acquiring and using the scented oils that Plaintiff regards as essential for his prayer ritual. Defendants contend that "the flammable nature of the oils presents a threat to the safety and security of both inmates and ADOC staff." (Defs.' Mot. for Summ.J. at 7.) Further, Defendants insist that the possession of scented oils by only Muslim inmates has led to bartering among the inmates, which is prohibited by prison policy, and has given rise to physical threats to inmate safety. *Id.*

██ Defendants' justifications easily satisfy the "logical relation" test articulated by the Ninth Circuit in *Standing Deer. See* 831 F.2d at 1528 (interpreting the *Turner* test to require a logical connection between prison regulations and penological concerns). Although Plaintiff claims that prison policy permits inmates to possess cigarette lighters, which are no doubt "flammable," this does not undermine the validity of Defendants' regulation with respect to flammable oils. Such oils pose a unique danger because they might be used to accelerate a fire once it is started. Additionally, because Defendants need not establish that its prohibition is causally related to a present institutional problem, Plaintiff's protestations that he has never used his oils improperly are unavailing. Regardless of whether Plaintiff's possession of oils has, to date, posed a threat to prison security, courts have rejected the causal standard Plaintiff urges because it would inevitably impede "the ability of corrections officials 'to anticipate security problems and to adopt innovative solutions.'" *O'Lone v. Shabazz*, 482 U.S. 342, 349, 107 S.Ct. 2400, 96 L.Ed.2d 282 (citing *Turner*). Moreover, because Plaintiff has demonstrated a propensity for arson, (ADOC Inmate Disciplinary Report, Statement of Facts in Support of Defs.' Mot. for Summ. J. Ex. EE), Defendants' concerns are amply supported by the record. Plaintiff, by contrast, has offered no admissible evidence to support his contention that the denial of oils is unjustifiable in light of legitimate security interests.

██ Defendants' limitation on the wearing of a kufi prayer cap is also justifiable. Prison policy permits Plaintiff to wear a kufi in his cell, in designated living areas, and during religious ceremonies. Because "[h]ead coverings are often utilized to identify participation in a specific racial and/or political group, which furthers gang activity and difficulties between such groups," however, prison policy prevents Plaintiff from wearing his prayer cap at other times. (Linderman Aff. ¶ 10.) In response, Plaintiff again misunderstands the "logical relation" inquiry of the *Turner* test. It is irrelevant that "Plaintiff has never been affiliated with any prison gang or organization ... [nor has] alliances with a specific racial and/or political groups." (Pl.'s Opp'n to Defs.' Mot. for Summ. J. at 7.) Defendants could reasonably conclude that kufis provide a potential symbol of group affiliation that threatens prison

security.[7]

■ Finally, Defendants have satisfied their burden of identifying a legitimate penological interest that is served by the prohibition on inmate beards. Defendants maintain that beards obscure inmate identity and may thus facilitate escape. Consequently, beards are permitted only for those inmates with a documented skin condition that justifies a medical waiver of the policy in particular cases. Even inmates granted such a waiver may not have beards in excess of a quarter inch in length.[8]

Plaintiff contends that the availability of a medical waiver for the wearing of beards undermines Defendants' claim that beards pose a danger to prison security. He alleges that "medical Shaving Waivers are given daily and routinely by prison staff," (Pl.'s Opp. to Defs.' Mot for Summ. J. at 7), but he provides no admissible evidence to substantiate this claim. Thus, though prison officials have determined that medical necessity may require exceptions to a generally applicable policy against the wearing of beards, there is no indication that the exception undermines the effect of an otherwise justifiable policy. Moreover, the Ninth Circuit has determined that prison policies prohibiting beards are "logically connected to valid penological interests." *Friedman v. Arizona,* 912 F.2d 328, 331 (9th Cir.1990). Accordingly, because Plaintiff has failed to provide evidence that the prohibition does not serve this policy goal, Defendants' justification satisfies the test of reasonableness.

**2. Alternative Means of Free Exercise**

■ The second element of the *Turner* test is whether prison policies that restrict a claimant's right of religious exercise provide a claimant with alternative means of religious exercise. Thus, "[w]here 'other avenues' remain available for the exercise of the asserted right, courts should be particularly conscious of the 'measure of judicial deference owed to corrections officials ... in gauging the validity of the regulation.' " *Turner,* 482 U.S. at 90, 107 S.Ct. 2254 (quoting *Pell v. Procunier,* 417 U.S. 817, 827, 94 S.Ct. 2800, 41 L.Ed.2d 495 (1974)) (internal citation omitted).

In the present case, Plaintiff is denied scented oils for use in his prayer ritual, is restricted in his ability to wear a kufi, and is prohibited from wearing a beard. Significantly, however, Plaintiff is permitted to observe Ramadan, Taleem, Eid Al–Adha (since 1995), Eid–Ul–Fitr, and the weekly Jum'ah prayer service. Although there is some dispute concerning Plaintiff's ability or willingness to attend services on particular dates, the availability of Muslim services is not in dispute. Additionally, Plaintiff is permitted to wear his kufi for religious observance, in his cell, and in designated living areas.

The many opportunities for Plaintiff to engage in religious observance indicate that Defendants have met the criteria set forth in *Turner.* In both *Turner* and *O'Lone,* decided the same term, the Court emphasized that the appropriate inquiry is not whether a *particular* form of exercise is available to prisoners, but whether prison regulations afford *other* means for inmates to exercise their rights. Thus, in *O'Lone,* the Court noted that though inmates were denied the opportunity to participate in the religiously mandated Friday Jum'ah service, they were able to participate "in other Muslim religious ceremonies." *O'Lone,* 482 U.S. at 352, 107 S.Ct. 2400. *See also Turner,* 482 U.S. at 91, 107 S.Ct. 2254 ("[T]he correspondence regulation does not deprive prisoners of *all means of expression.*") (emphasis added); *Friedman,* 912 F.2d at 332 (upholding a prohibition on inmate beards where alternative

---

**7.** In *Muhammad v. Lynaugh,* 966 F.2d 901 (5th Cir.1992), the Fifth Circuit upheld a prison regulation that restricted the wearing of kufis based on testimony that "weapons, such as shanks and razor blades, could easily be secreted inside a Kufi cap ... [and] that the inmates use symbolic banners to 'show ... their colors.' "(internal citations omitted). This lends further support to Defendants' claims that restrictions on the wearing of kufis serve a legitimate penological interest. Additionally, the Supreme Court has recognized the importance of permitting prison officials to combat gang activities in their institutions. *See Turner,* 482 U.S. at 91, 107 S.Ct. 2254.

**8.** By contrast, Plaintiff seeks a shaving waiver that will permit him to grow a one-inch beard. (Sutton Aff. ¶ 27.)

means of religious expression were available). Judged by this standard, Plaintiff had ample means of exercising his religious freedom.

### 3. Impact of Religious Accommodation

The next factor in gauging the reasonableness of a prison regulation that restricts the religious exercise of an inmate is the effect that accommodating the inmate's religious practice will have on other prisoners, prison personnel, and the allocation of prison resources. *See O'Lone,* 482 U.S. at 352, 107 S.Ct. 2400. In the present case, prison officials have determined that permitting oils, kufis, and beards poses a threat to prison security for inmates and staff.

Defendants offer admissible documentary evidence indicating that the possession of oils by Muslim inmates has resulted in intimidation and threats of violence against other inmates. (Linderman Aff. ¶ 9.) Additionally, some Muslim inmates apparently impermissibly exploited their ability to obtain otherwise contraband scented oils by engaging in prohibited bartering with other inmates. *Id.* Thus, Defendants' effort to accommodate the desire of Muslim inmates to use scented oils as part of their religious practice had the effect of "posing a risk to safe and orderly institutional operation." (Memorandum from Mike Linderman, 12/16/98.)

Similarly, Defendants' restriction on wearing kufis in undesignated areas of the prison is justified for maintaining prison security. Because prison officials have determined that kufis provide a means for inmates to express their affiliation with various prison groups, the effect of permitting unrestricted kufi-wearing is to facilitate group identification inimical to prison security. Thus, accommodating Plaintiff's demand to wear his kufi at all times could endanger the safety of inmates as well as prison staff.

Finally, Defendants' refusal to grant Plaintiff a religious waiver to the prison's no-

beard policy is likewise animated by security concerns. Because a beard tends to alter one's appearance, it inhibits the ability of prison officials to "rapidly and accurately identify each inmate." (Ryan Aff. ¶ 5.) Such changes in appearance thus facilitate escape and complicate the task of identifying inmates at the inmate store and on various work details. If Muslim inmates were permitted to grow one-inch beards, they would be able to "dramatically change the[ir] facial appearance ... in a matter of minutes." *Id.* Thus, granting Plaintiff's request for a religious shaving waiver could increase the likelihood of escape attempts and prevent staff from performing their essential task of monitoring inmate activity. Additionally, as the Ninth Circuit determined, another exception to the no-beard policy would likely strain prison resources because "prisoners would flood prison officials with claims" for religious exemption. *Friedman,* 912 F.2d at 332.[9] These considerations, taken together, suggest that accommodating Plaintiff's desire to wear a beard would pose a potential threat to prison security and unduly strain prison resources.

### 4. Absence of Ready Alternatives

The final element of the *Turner* test requires the Court to consider the availability of ready alternatives to a challenged prison regulation as an indication of its reasonableness. *See Turner,* 482 U.S. at 90, 107 S.Ct. 2254. "[T]he existence of obvious, easy alternatives may be evidence that the regulation is not reasonable, but is an 'exaggerated response' to prison concerns." *Id.* The Court, however, expressly rejected a "least restrictive alternative" test by which prison officials would "have to set up and then shoot down every conceivable alternative method of accommodating the claimant's constitutional complaint." *Id.* at 90–91, 107 S.Ct. 2254. Instead, "if an inmate claimant can point to an alternative that fully accommodates the prisoner's rights at de minimis cost to valid

---

**9.** Plaintiff points to the availability of medical shaving waivers to suggest that ADOC's beard policy is inconsistent. The Court notes, however, that the criterion for determining whether a medical waiver is warranted—i.e., if shaving causes an adverse physical reaction—is more readily determinable. By contrast, determination of whether a claimant is entitled to a reli-

gious shaving waiver would involve officials in a time-consuming process of ascertaining the nature and sincerity of a claimant's religious faith. The relatively minor strain in prison resources entailed by a medical shaving waiver undermines Plaintiff's position that a religious waiver is similarly feasible.

penological interests, a court may consider that as evidence that the regulation does not satisfy the reasonable relationship standard." *Id.* at 91, 107 S.Ct. 2254.

Plaintiff insists that the regulations against oils, unrestricted kufis, and beards represent "an exaggerated response to speculative security objectives." (Pl.'s Opposition to Defs.' Mot. for Summ. J. at 7).[10] Beyond expressing his demand for scented oils and unrestricted kufi-wearing, however, Plaintiff has not specified alternative policies that would satisfy his demand at a minimal cost to legitimate penological interests; he has, however, suggested that prison officials institute a Muslim shaving waiver to accommodate his desire to wear a beard.

Under the prison's former policy, which permitted only Muslim inmates to possess and use scented oils, officials documented a variety of inmate infractions stemming from the limited possession of otherwise prohibited oils. (Linderman Aff. ¶ 9.) The evidence indicates that threats of violence and prohibited commerce among inmates were undermining prison security and order. *Id.* Consequently, prison officials rescinded the limited-use oil policy in favor of a blanket prohibition on scented oils.

The accommodation regime, and its evident failure, suggest that Plaintiff's desire to restore Muslim oil privileges cannot be accomplished without significant costs to prison administration. When oils were permitted on a limited basis, security problems resulted. In order to avoid such problems, prison officials would have to allocate greater resources for monitoring and regulating the acquisition,[11] possession, and use of scented oils by Muslim inmates. As the *Turner* Court noted, "the sheer burden on staff resources" contributes to the judgment that a proposed alternative is inadequate. *Turner,* 482 U.S. at 93, 107 S.Ct. 2254. In this case, the greater staff vigilance that would be nec-

essary to avoid the documented abuses of oil privileges is by no means negligible. Consequently, there is no indication of a "ready alternative" to Defendants' blanket prohibition on scented oils that would cast doubt on the reasonableness of Defendants' policy.

Similarly, restrictions that prevent Plaintiff from wearing his kufi at all times serve the legitimate penological interest in order and security by inhibiting the ability of inmates to identify themselves and one another as members of rival groups. Although Plaintiff insists that he is not affiliated with any such group, a more narrowly tailored restriction—one that only applied to those with known group affiliations, for instance—would be costly to administer. Officials would have to ascertain which inmates were group members and police the wearing of kufis by only those inmates so designated. Because this would require prison staff supervising large numbers of inmates in the prison yard to distinguish between authorized and unauthorized wearers, this policy would be substantially more burdensome than a blanket prohibition. As such, it suggests that Defendants' regulation restricting the wearing of kufis is reasonable.

Finally, the reasonableness of Defendants' policy against inmate beards must be judged in light of the legitimate interest in prison security offered to justify it. Plaintiff has proposed that a "Muslim Shaving Waiver" would permit him to observe his religious mandate while preserving the prison's policy against beards. Defendants' recognition of a medical shaving waiver, Plaintiff contends, suggests that exceptions to the policy do not pose a substantial threat to prison security.

Although Plaintiff has proposed an alternative to Defendants' no-beard policy that accommodates his free exercise right, he has not established that it can be accomplished "at de minimis cost to valid penological interests." *Turner,* 482 U.S. at 91, 107 S.Ct. 2254. Plaintiff asserts that medical shaving

---

**10.** In suggesting that prison officials' security concerns are insufficient because they are "speculative," Plaintiff misapprehends the *Turner* standard. The Supreme Court emphasized the importance of allowing prison officials the flexibility "to *anticipate* security problems and to adopt innovative solutions to the intractable

problems of prison administration." *Turner,* 482 U.S. at 89, 107 S.Ct. 2254 (emphasis added).

**11.** Plaintiff's own considerable difficulties in obtaining oils in compliance with prison regulations demonstrate the potential complications created by a limited oil possession policy.

waivers are routinely granted, suggesting that any valid security objectives promoted by the no-beard policy have already been compromised. Plaintiff, however, does not substantiate this claim with admissible evidence and there is nothing in the record to support it. Consequently, any conclusion that the process for obtaining a medical shaving waiver has been abused is unwarranted. Prison officials may thus have concluded that the limited number of shaving waivers granted for medical necessity presents a manageable imposition on legitimate security concerns. The addition of a Muslim shaving waiver, however, by Plaintiff's own estimation, could add as many as 250 beards to the ADOC population.[12] Additionally, as the Ninth Circuit determined in *Friedman,* the availability of an exception is bound to strain institutional resources because officials would likely be inundated with exemption requests from both sincere and opportunistic inmates. *See Friedman,* 912 F.2d at 332.

Application of the *Turner* test reveals that Defendants' policies regarding scented oils, kufis, and beards are reasonably related to valid penological objectives. Plaintiff has not provided any admissible evidence to suggest otherwise. Accordingly, Defendants are entitled to summary judgment regarding Plaintiff's free exercise claims.

## II. Equal Protection

Plaintiff asserts an equal protection violation based on Defendants' refusal to provide a religious clergyman for Sahih Muslims. Additionally, Plaintiff claims that he has been denied the opportunity to receive religious articles from family members, whereas adherents of other faiths have been permitted this opportunity. This latter allegation is best analyzed as an equal protection claim.[13]

▆▆▆▆ Defendants acknowledge that the right to equal protection guaranteed by the Fourteenth Amendment extends to prison inmates, *see Cruz v. Beto,* 405 U.S. 319, 321–22, 92 S.Ct. 1079, 31 L.Ed.2d 263 (1972), but they note that the equal protection clause does not require identical treatment of all persons, *see San Antonio Indep. Sch. Dist. v. Rodriguez,* 411 U.S. 1, 24, 93 S.Ct. 1278, 36 L.Ed.2d 16 (1973), or even of all prison inmates. *See Norvell v. Illinois,* 373 U.S. 420, 423, 83 S.Ct. 1366, 10 L.Ed.2d 456 (1963). Instead, "[p]risons must afford an inmate of a minority religion 'a reasonable opportunity of pursuing his faith comparable to the opportunity afforded fellow prisoners who adhere to conventional religious precepts.'" *Freeman,* 125 F.3d at 737 (quoting *Cruz,* 405 U.S. at 321–22, 92 S.Ct. 1079). Accordingly, Defendants insist that differential treatment of prison inmates is only subject to rationality review in the absence of a showing that a "suspect class" has been subjected to disfavored treatment or that a fundamental right has been implicated by state action.[14] Fur-

---

12. Plaintiff asserts that there are "over 250 adherants [sic] in Arizona Department of Corrections." (Pl.'s Opp'n to Defs.' Mot. for Summ. J. at 9.) Because he claims that full beards are mandatory for such adherents, each of these inmates could be expected to seek a Muslim shaving waiver.

13. In their Motion for Summary Judgment, Defendants construe only Plaintiff's denial of clergy claim as an equal protection claim. They treat the denial of family-provided religious articles as a free exercise claim. Because Plaintiff claims that he was subjected to disfavored treatment with respect to the acquisition of religious items on the basis of his religious affiliation, however, Plaintiff's claim that he was uniquely denied access to family-provided items states a potential equal protection violation. *See Cooper v. Pate,* 378 U.S. 546, 546, 84 S.Ct. 1733, 12 L.Ed.2d 1030 (1964).

14. Having invoked the rational basis standard, Defendants neglect to apply it to the facts of this case. This oversight may reflect the fact that rationality review is typically so deferential that virtually any conceivable justification will suffice. *See, e.g., Williamson v. Lee Optical,* 348 U.S. 483, 488, 75 S.Ct. 461, 99 L.Ed. 563 (1955) (upholding a legislative classification based on speculation about the legislature's possible motives). In this case, however, because Plaintiff's First Amendment right is implicated, the Court "will closely scrutinize the reasonableness of any restriction imposed on a prisoner's activity in the exercise of his religion, and *especially so where the adherents of one faith are more heavily restricted than adherents of another.*" *Cooper v. Pate,* 382 F.2d 518, 521 (7th Cir.1967) (emphasis added). Although the Seventh Circuit's decision in *Cooper* predates the Supreme Court's adoption of the reasonableness test in *Turner,* the Seventh Circuit has since indicated that *"O'Lone* and *Turner* have served to clarify and amplify, rather than to depart from, the standard applied in

ther, "[t]o succeed on an equal protection claim, a plaintiff in a section 1983 claim must show that officials intentionally acted in a discriminatory manner." *Freeman*, 125 F.3d at 737.

In the present case, Plaintiff alleges that he was treated differently based on his religious affiliation and thereby denied "a reasonable opportunity to pursue his faith as compared to inmates of other faiths." *Id.* at 738. This allegation, contrary to Defendants' assertion, does implicate Plaintiff's fundamental right to free exercise. Accordingly, the relevant inquiry in the equal protection context is not simply whether legitimate penological interests justify limitations on Plaintiff's free exercise, but also whether those limitations are reasonable *when measured against the limitations placed on other inmates. See Cooper*, 378 U.S. at 546, 84 S.Ct. 1733 (holding that inmate stated a cause of action when "alleging that solely because of his religious beliefs he was denied ... privileges enjoyed by other prisoners"); *see also Freeman*, 125 F.3d at 738 (noting that *Turner*'s rational relation test does not resolve the issue of whether Muslim inmates were singled out for disfavored treatment).

Plaintiff's claim that he was denied equal treatment based on Defendants' failure to provide Muslim clergy of the Sahih variant is inadequate to establish an equal protection violation. Courts have consistently rejected the notion that "every religious sect or group within a prison ... must have identical facilities or personnel ... [A] chaplain, priest, or minister [need not] be provided without regard to the extent of the demand." *Cruz*, 405 U.S. at 322 n. 2, 92 S.Ct. 1079; *see also Johnson v. Moore*, 948 F.2d 517, 520 (9th Cir.1991) ("[T]he Constitution does not necessarily require prisons 'to pro-

vide each inmate with the spiritual counselor of his choice.'") (quoting *Allen v. Toombs*, 827 F.2d 563, 569 (9th Cir.1987)). Instead, inmates must be afforded reasonable opportunities to practice their religion. As noted above,[15] Plaintiff is provided considerable opportunity to practice his religion by possessing religious books, participating in Muslim services, and wearing a kufi. Additionally, Plaintiff has not alleged that other religious groups, of comparable size and character,[16] are afforded more favorable treatment. Consequently, Defendants' failure to provide Plaintiff with a particular religious representative does not amount to an equal protection violation.

Plaintiff also challenges Defendants' refusal to permit him to receive religious articles from his mother's business while permitting other inmates to receive religious articles, such as crosses, rosaries, and yarmulkes, from their families. Specifically, Plaintiff contends that he was denied scented oils even when they were permitted under prison policy, because they were sent by his mother rather than an approved religious vendor.

Defendants cite long-standing prison policy that prohibits inmates from receiving religious items from family members, a policy justified as necessary to prevent prisoners from receiving contraband. It is unclear from the record whether *all* religious articles from family members were prohibited at the time Plaintiff was denied these items, or whether only family-supplied *oils* were prohibited. If, as Plaintiff contends, other inmates were permitted to receive religious articles from family members, this suggests that the refusal to permit Plaintiff to receive oils from family members could not be justified with reference to a blanket policy that

---

[Cooper]." *Hadi v. Horn*, 830 F.2d 779, 784 (7th Cir.1987). Additionally, though the Supreme Court's *Cooper* decision, which held that a prisoner's claim of differential treatment based on religious affiliation stated a cause of action, also predates *Turner*, the Court has continued to cite *Cooper* with approval. *See, e.g., McCarthy v. Bronson*, 500 U.S. 136, 141, 111 S.Ct. 1737, 114 L.Ed.2d 194 (1991).

**15.** I.B.2. "Alternative Means of Exercise."

**16.** Plaintiff recognizes that the Sahih variant of the Muslim faith is not a mainstream religion. (Compl. at 5D.) As such, there is likely to be less demand for the services of Sahih clergy relative to other faiths and greater difficulty in finding a qualified representative. To this extent, Plaintiff and adherents of other faiths are not similarly situated and thus need not be afforded the same treatment. *See Plyler v. Doe*, 457 U.S. 202, 216, 102 S.Ct. 2382, 72 L.Ed.2d 786 (1982).

prohibits articles supplied by family members.

 Regardless of whether other inmates have been permitted to receive religious items from family members, however, Plaintiff cannot prevail on his equal protection claim absent a showing that other prisoners were permitted to receive *oils* from family members. The Supreme Court has consistently held that " 'the Constitution does not require things which are different . . . to be treated in law as though they were the same.' " *Skinner v. Oklahoma*, 316 U.S. 535, 540, 62 S.Ct. 1110, 86 L.Ed. 1655 (1942) (quoting *Tigner v. Texas*, 310 U.S. 141, 147, 60 S.Ct. 879, 84 L.Ed. 1124 (1940)). Thus, the receipt of oils, found by prison officials to pose unique security concerns, may be appropriately subject to different institutional rules. As the Supreme Court has recognized that states "may mark and set apart the classes and types of problems according to the needs and as directed or suggested by experience." *Id.*

In this case, Defendants have provided reasonable grounds for prohibiting an inmate from receiving religious materials supplied by family members: "to prevent the possibility of receipt of contraband into the institution." (Linderman Aff. ¶ 8.) Scented oils, especially when packaged without a list of ingredients,[17] no doubt pose unique security concerns. Accordingly, because there is no evidence to suggest that Muslim inmates were denied family-supplied oils that other inmates were permitted to receive, Plaintiff's equal protection claim with respect to the acquisition of oils from family members is unsupported.[18] Plaintiff's equal protection claim thus fails because he has not shown that he was subjected to disfavored treatment on the basis of his religious affiliation.

Defendants point out that Plaintiff has also failed to adduce admissible evidence to establish that any disfavored treatment he received was intentional. Although courts have found that "[p]roof of discriminatory motive . . . can in some situations be inferred from the mere fact of differences in treatment," *International Brotherhood of Teamsters v. United States*, 431 U.S. 324, 335 n. 15, 97 S.Ct. 1843, 52 L.Ed.2d 396 (1977); *see also Sischo–Nownejad v. Merced Community College Dist.*, 934 F.2d 1104, 1112 (9th Cir. 1991) (quoting same), Plaintiff has neither demonstrated that he was treated differently from those similarly situated nor provided corroborating evidence of discrimination that, in previous cases, has supported the inference that a defendant acted from discriminatory motives. *See, e.g., Freeman*, 125 F.3d at 738 n. 6 (noting that abusive epithets may be evidence of intentional discrimination); *Sischo–Nownejad*, 934 F.2d at 1112 ("[T]he fact that stereotyped remarks were made by [Plaintiff's] superiors at the same time they were subjecting her to less favorable working conditions is sufficient to raise an inference of discriminatory intent."). In this case, there is no evidence of discriminatory treatment or discriminatory motive that would support Plaintiff's equal protection claim. Accordingly, Defendants are entitled to summary judgment on Plaintiff's equal protection claim.

### III. Obstruction of Mail

 Plaintiff contends that Defendants obstructed his mail because they retained as contraband a brochure sent by his mother and failed to notify Plaintiff of its arrival for ten months. The brochure advertised products available from Plaintiff's mother's business, Astrolight 2000. Defendants contend that the brochure was initially

---

**17.** Although both parties' arguments are addressed to the refusal of Defendants' to permit Plaintiff to receive oils supplied by his mother, the evidence indicates that the oils supplied by Plaintiff's mother did not otherwise conform to prison regulations because they lacked a manufacturer's label listing the ingredients. This inadequate labeling, coupled with the fact that the oils were not supplied by an approved vendor, easily supports Defendants' refusal to permit Plaintiff to receive the oils.

**18.** As further evidence that Plaintiff's equal protection claim concerning family-supplied religious items is meritless, the Court notes that Plaintiff apparently *was* permitted to receive kufi prayer caps supplied by his mother. (Statement of Facts in Support of Defs.' Mot. for Summ. J.Exs.E, O.) This suggests that it was family-supplied oils, not Muslim religious articles per se, that triggered the denial.

retained as contraband because it was unclear whether inmates were permitted to possess the items it advertised.[19] According to Plaintiff, however, the brochure, which offered a variety of items for sale, was not materially distinguishable from literature routinely permitted to other prisoners, including magazines offering items for sale that prisoners are not permitted to possess.[20] (Pl.'s Opp'n to Defs.' Mot. for Summ. J. at 15.)

Defendants concede that there was a ten-month delay in processing the brochure sent by Plaintiff's mother, but they claim that the delay resulted from a miscommunication among various prison officials. Defendants maintain that the brochure was confiscated in order for prison officials to determine whether the material it offered for sale was religious.[21] Defendants further contend that the brochure was then misplaced and was not reviewed by Chaplain Maliepaard until he returned to work after an extended illness. At that time, it was determined that Astrolight 2000 was not an approved vendor of religious items so Plaintiff was given the option of returning the brochure to Astrolight.

The Supreme Court has held that prison regulations governing the denial of incoming mail to prisoners are subject to the same reasonableness standard employed in *Turner*. *See Thornburgh v. Abbott*, 490 U.S. 401, 404, 109 S.Ct. 1874, 104 L.Ed.2d 459 (1989) (adopting *Turner*'s reasonableness test for mail censorship regulations). Under the mail regulations approved in *Thornburgh*, prison officials were permitted to reject mail if it determined that it was "detrimental to the security, good order, or discipline of the institution or if it might facilitate criminal activity." *Id.* at 404, 109 S.Ct. 1874. Additionally, the Court noted that such procedural safeguards as prompt notification that mail had been rejected contributes to the reasonableness of a regulation. *Id.* at 406, 109 S.Ct. 1874. The Court also emphasized that in cases dealing with incoming publications targeted at a general audience, it is significant that "material of this kind reasonably may be expected to circulate among prisoners, with the concomitant potential for coordinated disruptive conduct." *Id.* at 412, 109 S.Ct. 1874. Thus, it is not merely a concern that a particular inmate would have access to a publication that justifies denial of incoming mail, but the related concern that publications not targeted to particular inmates may cause disruptions in prison order. Finally, the Court acknowledged the institutional expertise of prison officials who confront "the difficult and delicate problems of prison management," noting that the "Court has afforded considerable deference to the determinations of prison administrators who ... regulate the relations between prisoners and the outside world." *Id.* at 407, 109 S.Ct. 1874.

Application of the *Thornburgh* standards in this case indicate that Defendants' regula-

19. There is some confusion regarding the precise contents of the subject mail. Although Defendant Laswell indicated that a "piggyback" letter was included in the mailing with the Astrolight 2000 brochure, (Pl.'s First Set of Non–Uniform Interrogs. to Def. Laswell, No. 6), Plaintiff's mother denies that she sent such a letter. (Youssef Aff. ¶ 3.) Additionally, there is no other evidence of a piggyback letter. Because the obstruction issue is not affected by the presence or absence of the piggyback letter, the Court need not resolve this discrepancy. Plaintiff, however, contends that this apparent inconsistency establishes the willfulness of Defendants' mishandling of his mail. In fact, however, the discrepancy is also consistent with Defendants' characterization of its handling of Plaintiff's mail as negligent and Plaintiff has provided no evidence of Defendant's intent to deprive him of his mail.

20. Plaintiff did not allege in his Complaint that other inmates were permitted to receive the sort of publications he lists nor has he provided any evidence to substantiate his claim. Plaintiff merely asserts in his Opposition to Defs.' Motion that such publications are permitted. Nevertheless, because *pro se* complaints are to be construed generously, *see Haines v. Kerner*, 404 U.S. 519, 520, 92 S.Ct. 594, 30 L.Ed.2d 652 (1972), the Court assumes for the purposes of analyzing Plaintiff's obstruction claim that such publications are permitted.

21. Defendant Laswell, who initially confiscated the brochure, maintains that she did not know the brochure was from Plaintiff's mother's business. (Laswell Aff. ¶ 2.) Plaintiff has provided no evidence to indicate otherwise, so the Court will assume that Defendants were unaware that Sakina Nura Youssef, the proprietor of Astrolight 2000, was also Plaintiff's mother.

tions for screening Plaintiff's mail are reasonable in light of legitimate penological interests. ADOC policy, like that approved in *Thornburgh*, defines contraband to include those items "whose use or possession would endanger the safety, security or preservation of order in a correctional facility." (Statement of Facts in Support of Defs.' Mot. for Summ.J.Ex.RR.) Additionally, ADOC policy provides for prompt notification that a piece of incoming mail has been rejected. *Id.* ADOC policy is thus in conformity with well established standards of inmate mail screening and is therefore facially valid.

Plaintiff's claim, however, is not addressed to ADOC's regulations per se, but rather to Defendants' application of the policy in denying him the Astrolight brochure. As noted, Plaintiff claims that other inmates were permitted to receive publications advertising items for sale that inmates are not permitted to possess. Additionally, Plaintiff points to Defendants' ten-month delay in notifying him of the brochure's arrival and rejection as grounds for his obstruction claim.

Defendants maintain that the reason for denying Plaintiff access to the brochure was that Astrolight 2000 was not an approved vendor of religious items. Defendants also insist that the ten-month delay in processing the Astrolight brochure amounts, at its worst, to negligence and is thus insufficient to state a claim under § 1983. Section 1983,

they correctly contend, requires an intentional violation of an individual's rights. According to Defendants, because Plaintiff has provided no admissible evidence to support his contention that Defendants' actions in withholding his mail were "deliberate and done with malice," (Pl.'s Opp'n to Defs.' Mot. for Summ.J. at 2.), they are entitled to summary judgment on his mail obstruction claim.

Because Plaintiff was not permitted to order products from Astrolight, it was reasonable for Defendants to deny him access to a vendor with whom he was not permitted to transact.[22] Unlike the publications that Plaintiff claims other inmates are permitted to receive despite the fact that they offer items for sale that inmates cannot possess, the brochure at issue is nothing more than an offer for sale of unauthorized items. As such, it is distinguishable from those publications listed by Plaintiff because they are not exclusively devoted to the advertisement of unauthorized items.[23] Additionally, as Defendants note, Plaintiff has failed to provide any evidence that Defendants' conduct in delaying the processing of his mail was intentional. Although Defendants' analysis of this issue is incomplete, they have correctly concluded that intentional conduct is required for a § 1983 violation in the context of mail obstruction.[24] Accordingly, Defendants are entitled to summary judgment on Plaintiff's mail obstruction claim.

---

**22.** Additionally, allowing a brochure devoted to the sale of unauthorized items might contribute to institutional disorder by fomenting "coordinated disruptive conduct" among the prison population. *Thornburgh*, 490 U.S. at 412, 109 S.Ct. 1874.

**23.** As noted, Plaintiff does not specify or establish the precise character of the publications permitted. Because he characterizes them as "magazines," however, even a generous construction of his claim does not establish that other inmates were permitted to receive advertising *brochures* for items they were not permitted to possess. Although magazines may contain advertisements, they contain other content as well.

**24.** Defendants cite *Daniels v. Williams*, 474 U.S. 327, 106 S.Ct. 662, 88 L.Ed.2d 662 (1986) for the proposition that "[n]egligence ... cannot provide the basis of an action under 42 U.S.C. § 1983." (Defs.' Mot. for Summ.J. at 15.) The Court in

*Daniels*, however, was careful to distinguish among various types of § 1983 claims, noting that the right at issue determines the level of culpability necessary to state a claim: "[D]epending on the right, merely negligent conduct *may not be* enough to state a claim." *Daniels*, 474 U.S. at 330, 106 S.Ct. 662 (emphasis added). At issue in *Daniels* was a due process claim and the Court determined that mere negligence was not enough. However, the Court did not determine the level of culpability necessary for § 1983 claims in other contexts, indicating that § 1983 itself has no culpability requirement so the level is determined by the substantive constitutional or statutory provision at issue. In this case, the *obstruction statute requires that one act* "with design to obstruct the correspondence." 18 U.S.C. § 1702. This suggests that intent is a requirement for an obstruction-based § 1983 claim. *Accord Hines v. Boothe*, 841 F.2d 623, 624 (5th Cir.1988) ("Negligence does not state a claim under section 1983 and the facts alleged by Hines with regard to the loss of his legal mail do not constitute more than negligence.").

Accordingly,

**IT IS ORDERED** granting Defendants' Motion for Summary Judgment (doc. # 71) on all counts of Plaintiff's claim.